BONNIE GOODMAN, COMPLAINANT-APPELLANT AND CROSS-RESPONDENT, v. LONDON METALS EXCHANGE, INC., DR. MERRILL K. GELLIS AND IRENE SCHOEN, RESPONDENTS-RESPONDENTS AND CROSS-APPELLANTS.

Argued January 12, 1981—Decided April 22, 1981.

20

24

*Joseph M. Gorrell,* Deputy Attorney General, argued the cause for appellant and the Division on Civil Rights (*John J. Degnan,* Attorney General of New Jersey, attorney; *Erminie L. Conley,* Assistant Attorney General, of counsel; *Judith E. Rodner,* Deputy Attorney General, on the briefs).

*Robert Dilts* argued the cause for respondents (*Ferro, Lamb & Kern,* attorneys; *Nancy C. Ferro,* on the briefs).

The opinion of the Court was delivered by

SCHREIBER, J.

Complainant, Bonnie Goodman, filed a complaint against London Metals Exchange, Inc. (London Metals), its owner, Dr. Merrill Gellis, and its office manager, Irene Schoen, with the Division on Civil Rights alleging denial of a job as field representative because of her sex. See *N.J.S.A.* 10:5–1 *et seq.* At the conclusion of a hearing, the hearing examiner found that discrimination had been proven and recommended that she be offered the next available field representative position and awarded back pay at the rate of $150 per week plus $750 for humiliation, pain and mental anguish. The director of the Division increased the back pay to $175 per week with interest at the rate of 8% per annum and otherwise adopted the hearing examiner's recommendations.

On respondents' appeal the Appellate Division affirmed with the exception of the provision awarding back pay. Finding that the complainant had been unwilling to accept jobs which were available and paid less than $135 per week, the Appellate Division concluded that back pay damages should be reduced by $135 per week which complainant could have earned had she

accepted one of the available jobs. In addition, the court ordered the back pay award reduced by the actual earnings during the period in question. The Division on Civil Rights and complainant petitioned for certification and respondents cross-petitioned. We granted both petitions. 84 *N.J.* 446, 447 (1980).

The respondents' contentions have centered on the appropriate burden of proof in a discrimination case and complainants' failure to meet that burden. The complainants' concern is the propriety of mitigation in the computation of lost wages. We turn first to the facts.

Dr. Merrill Gellis, a dentist, formed London Metals in October 1973 to purchase gold alloys and silver amalgam accumulated by dentists in the course of their business. After soliciting dentists by telephone, the company would send field representatives to those dentists who had indicated a willingness to sell the scrap metal. The business commenced on a small scale. Dr. Gellis's wife and son traveled in the field and Irene Schoen did the phoning. Dr. Gellis supervised the operation while continuing to carry on his dentistry practice, both being conducted at his dental office in Ridgewood. The business grew. In a short time there were several telephone solicitors and field representatives. Irene Schoen became the office manager. In the early days field representatives primarily visited dentists in New Jersey. Visits to dentists were infrequent because of the substantial amount of time required to accumulate a sufficient amount of material for sale. Thus it became necessary to extend the scope of operations into wider geographical areas. Field representatives would travel substantial distances and return after one or two weeks on the road.

The turnover rate was high among field representatives and the company frequently advertised for help. In line with this policy it placed an advertisement in the Bergen Record of Sunday, July 27, 1975, seeking field representatives. The advertisement did not reveal the company name or address, but suggested that applicants telephone a certain number. On

Monday, July 28, complainant, Bonnie Goodman, who was then living in an apartment in Hackensack with her mother, Marie, telephoned London Metals' office in response to the advertisement. Although there was a sharp conflict in the testimony with respect to what occurred thereafter, the hearing examiner and director accepted the complainant's version which follows.

Bonnie Goodman said that, after identifying herself to the woman answering the phone, she was told that the position involved extensive travel. Miss Goodman replied that she was accustomed to traveling in her previous occupations in real estate sales, district supervision and personnel work. The woman twice more emphasized the need to travel and then told her that the position required a knowledge of precious metals. When Miss Goodman asked how much knowledge was required, the woman responded that a person would have to know all about metals, and that the experience Miss Goodman had related was not sufficient. The conversation ended.

Miss Goodman suggested to her mother, who had a knowledge of precious metals, that she apply for the position. Mrs. Goodman telephoned and a woman who answered responded that the position involved extensive travel. Mrs. Goodman replied that her previous jobs had involved travel, and that she was a widow with no young dependents. She was then told that a knowledge of precious metals was required. When Mrs. Goodman told her of her experience with precious metals, the woman responded that her knowledge was insufficient, and hung up the phone.

Miss Goodman, believing that she had been discriminated against because she was a female, phoned the Division on Civil Rights and arranged for an appointment on Wednesday. Her mother and she visited the Division's office and lodged a complaint. A male enforcement chief in the Division telephoned London Metals for an interview. He related that, after a discussion of the travel requirements, an interview was scheduled despite his assertions that he had no sales experience. No mention was made of metals.

Further investigation by the Division revealed that a field representative position was filled by a male on August 4, 1975. Moreover, although three females had been hired as field representatives between August and November 1973, all had left by December 1973. From January 1, 1974 until the hearings on May 31, 1978, London Metals had hired 51 males as field representatives and no females. Peggy Bracco who had worked as a field representative in 1973 testified that Dr. Gellis had initially believed females were preferable as field representatives because "women would have an easier time getting in the door of a dentist," most of whom were men. However, he changed his opinion primarily because women were reluctant to be away from home for four or five days and decided he would not hire any more females as field representatives.

London Metals' version of its hiring practices and relations with the Goodmans differs substantially from that described in the complainant's case. The respondents' evidence consisted of the testimony of Dr. Gellis, Irene Schoen, Celeste Dahlin who accepted incoming calls for interviews, a field representative, and two telephone solicitors. Their testimony accounts for only one conversation on July 28, 1975, presumably with Bonnie Goodman, in which she became nasty and abusive and, upon being denied an interview, threatened that "you have not heard the last of it." This was the only occasion upon which an interview had ever been refused. The more important job qualifications were a pleasant personality, good appearance, articulateness, and a willingness to travel. No technical knowledge of precious metals was required. Moreover, although the company had always been willing to engage females as field representatives, very few sought job interviews and, after the interview, those few refused the job.

The hearing examiner's recommended findings of facts and conclusions of law included an extensive review of all the evidence. Having found that Bonnie Goodman's version of the episode was credible, the examiner concluded that respondents had discriminated against her because of her sex. The suggest-

ed remedy included back pay in the amount of $12,353. This was computed at the rate of $150 per week for the period from July 28, 1975 to December 31, 1977, less actual earnings. He also recommended she be awarded $750 for humiliation, pain and mental anguish and be offered the next field representative position.

The director of the Division on Civil Rights concurred in the findings of fact and conclusions of law and ordered the recommended remedy with two modifications. Since the rate of pay for field representatives had changed in June 1975 from $150 per week to straight commissions, the Director averaged the salaries of field representatives between July 28, 1975 and December 31, 1977, and applied that figure, $175 per week, in determining the amount of back pay. He also added interest at the rate of 8% per annum to be computed until the date complainant was offered a position as a field representative.

The Appellate Division modified the back pay award by reducing the weekly rate of $175 to $40. It reached that conclusion because Miss Goodman refused to consider other available employment opportunities that did not pay at least $135 a week. Moreover, the Appellate Division held that the award should cover the period from the date of discrimination until the date of her employment in an equivalently paying position. It ordered the amount due further reduced by sums actually earned.

I.

Judicial appellate review of an administrative agency's factual determinations is circumscribed. If there is sufficient credible competent evidence to support those conclusions, the appellate tribunal must uphold those findings. *Jackson v. Concord Co.*, 54 *N.J.* 113, 117–118 (1969); *Clover Hill Swimming Club, Inc. v. Goldsboro*, 47 *N.J.* 25, 36 (1966). Though an independent *de novo* examination of the record might lead a reviewing court to an opposite conclusion, the court's obligation

is to examine the record in order to determine whether the evidence and the reasonable inferences to be drawn therefrom could reasonably support the decision. *Hornauer v. Division of Alcoholic Beverage Control*, 40 *N.J.Super.* 501, 504–506 (App. Div.1956). Justice Francis, in *Weston v. State*, 60 *N.J.* 36 (1972), observed that "in the final analysis for a court to sustain an administrative decision, which affects the substantial rights of a party, there must be a residuum of legal and competent evidence in the record to support it." *Id.* at 51. Our scope of review is even more limited. We must ask whether the Appellate Division correctly applied the rule. If it did, then the question is whether the Appellate Division was right or wrong in sustaining the findings. When both the agency and the Appellate Division have made the same findings, we ordinarily would affirm unless both were clearly in error. See *State v. Johnson*, 42 *N.J.* 146, 163 (1964).

Though a *de novo* review of this record could have led to different factual findings, it is also clear, as the Appellate Division concluded, that the director's and hearing examiner's findings of fact were supported by sufficient credible evidence in the record.[1] We are satisfied that the Appellate Division properly applied that standard.

London Metals argues that as a matter of law the director and hearing examiner misapplied the burden of proof. It is settled that the complaining party must show by a fair preponderance of competent credible evidence that the respondent has violated the Law Against Discrimination, *Peper v. Princeton University Board of Trustees*, 77 *N.J.* 55, 80 (1978), and that there is a causal relationship between the violation and the award to the discriminatee, *Countiss v. Trenton State College*, 77 *N.J.* 590, 595–599 (1978). Thus it was incumbent upon

---

[1]The Appellate Division did not discuss the evidence in detail, relying on *R.* 2:11–3(e)(1)(D) providing that when the decision of an administrative agency is supported by sufficient credible evidence on the record as a whole, affirmance without opinion is justified.

Bonnie Goodman to establish a violation of *N.J.S.A.* 10:5–12, which provides it shall be unlawful discrimination for an employer "to refuse to hire or employ" any person because of that individual's sex except "in those certain circumstances where sex is a bona fide occupational qualification, reasonably necessary to the normal operation of the particular business or enterprise." She also had the burden of demonstrating that she was entitled to be hired with or without back pay. *N.J.S.A.* 10:5–17.

Both parties agree that the complainant's burden includes satisfactory proof of discriminatory motive or intent. It is a crucial element in a discrimination case of this nature. See *International Brotherhood of Teamsters v. United States*, 431 *U.S.* 324, 335 n. 15, 97 *S.Ct.* 1843, 1854–1855 n. 15, 52 *L.Ed.2d* 396, 415 n. 15 (1977). However, to require a plaintiff to prove intent or motive might often be an insuperable burden. This Court stated in *Peper v. Princeton University Board of Trustees* that "[a]cts of unlawful employment discrimination are more difficult to prove than are any other proscribed acts of discrimination. No employer lists his qualifications for [hiring] as explicitly excluding persons of a particular sex." 77 *N.J.* at 80. For another case discussing this problem see *Parker v. Dornbierer*, 140 *N.J.Super.* 185 (App.Div.1976), where the court wrote:

> The act of discrimination requires intent since it in itself is a mental process under which one willingly chooses one or another of alternatives. Of course, we recognize that discrimination is not usually practiced openly and that intent must be found by examining what was done and what was said in the circumstances of an entire transaction. [*Id.* at 189]

Because of the policy evinced in the Law Against Discrimination, it is appropriate that the burden of proof be molded and placed to fulfill that public policy. The Legislature has given the Law Against Discrimination a special niche in the legislative scheme by declaring that "practices of discrimination ... because of race, creed, color, national origin, ancestry, age, sex, marital status or because of their liability for service in the Armed Forces of the United States, are a matter of concern to

the . . . State, and that such discrimination threatens not only the rights and proper privileges of the people but menaces the institutions and foundation of a free democratic State." *N.J. S.A.* 10:5–3; see *David v. Vesta Co.*, 45 *N.J.* 301, 327 (1965). This law is aimed at fulfilling provisions of the state constitution guaranteeing civil rights. *N.J.S.A.* 10:5–2. Because of the express policy underlying the statute and the difficulty in proving an individual's intent or motive, we chose in *Peper v. Princeton University Board of Trustees*, 77 *N.J.* at 81–84, to adopt the methodology of *McDonnell Douglas Corporation v. Green*, 411 *U.S.* 792, 93 *S.Ct.* 1817, 36 *L.Ed.2d* 668 (1973), and "commend[ed] the *McDonnell Douglas* standards to our trial courts as a starting point in actions brought under the Law Against Discrimination. . . ." 77 *N.J.* at 83.

The *McDonnell Douglas* approach requires a plaintiff in this context to establish a prima facie case of unlawful sex discrimination by demonstrating by a preponderance of the evidence that (1) she belongs to a protected class, (2) she applied and was qualified for the position for which the employer was seeking applicants, (3) despite her qualifications she was rejected, and (4) after rejection, the position remained open and the employer continued to seek applications from persons of plaintiff's qualifications. *Texas Department of Community Affairs v. Burdine*, —— U.S. ——, ——, 101 *S.Ct.* 1089, 1092–1093, 67 *L.Ed.2d* 207, 210 (1981); *McDonnell Douglas Corp. v. Green*, 411 *U.S.* at 802, 93 *S.Ct.* at 1824, 36 *L.Ed.2d* at 677. Establishment of the prima facie case gives rise to a presumption that the employer unlawfully discriminated against the applicant. *International Brotherhood of Teamsters v. United States*, 431 *U.S.* at 358, 97 *S.Ct.* at 1866, 52 *L.Ed.2d* at 429. The burden of going forward shifts to the employer to rebut the presumption of undue discrimination by "articulat[ing] some legitimate, nondiscriminatory reason for the employee's rejection." *McDonnell Douglas Corp. v. Green*, 411 *U.S.* at 802, 93 *S.Ct.* at 1824, 36 *L.Ed.2d* at 678. See *Texas Department of Community Affairs v. Burdine*, —— U.S. at ——, 101 *S.Ct.* at 1094, 67 *L.Ed.2d* at

215; *Board of Trustees v. Sweeney*, 439 *U.S.* 24, 24–26, 99 *S.Ct.* 295, 295–296, 58 *L.Ed.*2d 216, 218–219 (1978); *Furnco Construction Co. v. Waters*, 438 *U.S.* 567, 576–578, 98 *S.Ct.* 2943, 2949–2950, 57 *L.Ed.*2d 957, 967–968 (1978). The plaintiff must then have the opportunity to prove by a preponderance of the evidence that the legitimate nondiscriminatory reason articulated by the defendant was not the true reason for the employment decision but was merely a pretext for discrimination. The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff. *Texas Department of Community Affairs v. Burdine*, —— *U.S.* at ——, 101 *S.Ct.* at 1094, 67 *L.Ed.* 2d at 215; *McDonnell Douglas Corp. v. Green*, 411 *U.S.* at 804, 93 *S.Ct.* at 1825, 36 *L.Ed.*2d at 678–679.

The hearing examiner in this case applied the *McDonnell Douglas* approach. As a female, plaintiff belonged to a protected class. There was evidence that she was qualified to be a field representative and sought the position. Both sides acknowledged her rejection. Further, the record is undisputed that the vacancy continued to exist and was subsequently filled.

In addition to establishing the four *McDonnell Douglas* elements, complainant introduced other proof to support her case. Although London Metals had employed four female field representatives during the initial months of the company's existence, thereafter it hired 51 male and no female field representatives. These data support the inferences to be drawn from the application of the *McDonnell Douglas* criteria. See, *e. g., Teamsters v. United States*, 431 *U.S.* at 339, 97 *S.Ct.* at 1856, 52 *L.Ed.*2d at 417–418; *McDonnell Douglas Corp. v. Green*, 411 *U.S.* at 805, 93 *S.Ct.* at 1825, 36 *L.Ed.*2d at 679. Moreover, there is testimony that Dr. Gellis had acknowledged his intent that females were not to be employed as field representatives.

A prima facie case having been established, the burden shifted to respondents to articulate a legitimate nondiscriminatory reason for refusing to consider Bonnie Goodman for the position.

*Board of Trustees v. Sweeney*, 439 *U.S.* at 24, 99 *S.Ct.* at 295, 58 *L.Ed.*2d at 218. Respondents testified that the female caller believed to be complainant was denied an interview because a vital job qualification, an affable, ingratiating personality, was lacking. She did not appear to meet that requirement because her attitude over the telephone was unpleasant. Respondents assert that the hearing examiner, by failing to accept this explanation, abandoned the *McDonnell Douglas* procedure. The contention is misplaced. After analyzing complainant's evidence the examiner stated:

> She thus met the burden of establishing a *prima facie* case and the burden shifted to the respondents to come forward with a legitimate nondiscriminatory reason for her rejection. However, even though the *Peper* standard shifted the burden to respondents of making that showing, when all is said and done, the case ultimately turns on credibility and on whose version of the facts is accepted.

█ The explanation given by respondents for complainant's rejection was sufficient for the employer to meet its burden of articulating a legitimate nondiscriminatory reason for the rejection and thus destroy "the legally mandatory inference of discrimination arising from the plaintiff's initial evidence." *Texas Department of Community Affairs v. Burdine*, —— U.S. at —— n. 10, 101 *S.Ct.* at 1095 n. 10, 67 *L.Ed.*2d at 216 n. 10. However, the trier of fact may nevertheless be persuaded by that evidence and its inferences combined with that adduced from the respondents that the employer's proposed explanation is unworthy of belief and is nothing more than a mere pretext for unlawful discrimination. *Id.* The hearing examiner was convinced that the testimony of complainant and her mother was "entirely truthful." He asserted "their demeanor even under aggressive cross-examination was such that the hearing examiner believes that they are both highly reserved, serious and taciturn to the extent that neither of them is capable of engaging in a conversation such as that testified to by respondents. It is most difficult to believe that they would have been abrupt and hostile and contentious . . . ." The hearing examiner concluded that the reason given by the employer for Miss Goodman's rejection was pretextual and that the true reason for

her rejection was "because she was a woman." Deferring to the examiner's opportunity to observe the witnesses' demeanor, weigh the employer's proffered explanation and fix its sufficiency and credibility, we find that the record is replete with evidence supporting the factual determinations made by the hearing examiner.

## II.

When a wrongful discharge of an employee occurs the measure of damages is usually the employee's salary for the remainder of the employment period. *Moore v. Central Foundry Co.*, 68 *N.J.L.* 14, 15 (Sup.Ct.1902). However, since the employee has available time which may be used profitably, the employer has been permitted to reduce its damages by showing that the employee has earned wages from other employment. *Sandler v. Lawn-A-Mat Chemical & Equipment Corp.*, 141 *N.J. Super.* 437, 455 (App.Div.1976), certif. den. 71 *N.J.* 503 (1976); *Rogozinski v. Airstream by Angell,* 152 *N.J.Super.* 133, 158 (Law Div.1977), mod. 164 *N.J.Super.* 465 (App.Div.1979). The employer may also reduce the award by showing that the employee could have secured other employment by reasonable efforts, but did not. See *Roselle v. La Fera Contracting Co.*, 18 *N.J.Super.* 19, 28 (Ch.Div.1952); *Goebel v. Pomeroy Brothers Co.*, 69 *N.J.L.* 610, 611 (Sup.Ct.1903); *Moore v. Central Foundry Co.*, 68 *N.J.L.* at 15–16; *Larkin v. Hecksher*, 51 *N.J.L.* 133, 138 (Sup.Ct. 1888).

The Law Against Discrimination authorizes the director to order affirmative action including hiring with or without back pay as in his judgment will effectuate the purpose of the act. *N.J.S.A.* 10:5–17. However, the statute does not expressly require consideration of principles of mitigation when back pay is to be awarded.[2] The basic purpose of awarding back pay is to

---

[2]Mitigation does not excuse the wrong or violation. Rather it simply limits the amount of the judgment. *Restatement, Contracts*, § 336(1), comment d at 537 (1932).

make the discriminatee whole by reimbursement of the economic loss suffered, though it also should correlatively discourage and deter unlawful discrimination. See *Albermarle Paper Co. v. Moody*, 422 *U.S.* 405, 421, 95 *S.Ct.* 2362, 2373, 45 *L.Ed.*2d 280, 299 (1975). If the discriminatee had been working an award of the full amount of back pay would exceed the economic loss. Mitigation principles encourage the unemployed to seek employment, a socially desirable goal. Accordingly, unreasonable refusals to accept other proffered employment or failure to exercise reasonable diligence in seeking other suitable available positions trigger mitigation principles. We discern no reason why those principles of mitigation should not be applied in awarding back pay under the Law Against Discrimination.

The United States Supreme Court when confronted with a similar problem under the applicable section of the National Labor Relations Act (NLRA), 29 *U.S.C.* § 160(c), which like the provision in the Law Against Discrimination, *N.J.S.A.* 10:5-17, contains no reference to mitigation and has substantially the same language relating to back pay as that section, reached the same result. In *Phelps Dodge Corp. v. NLRB*, 313 *U.S.* 177, 61 *S.Ct.* 845, 85 *L.Ed.* 1271 (1941), back pay awards under the NLRA were held to be subject to principles of mitigation. The Supreme Court reasoned that "[s]ince only actual losses should be made good, it seems fair that deductions should be made not only for actual earnings by the worker but also for losses which he willfully incurred." *Id.* at 198, 61 *S.Ct.* at 854, 85 *L.Ed.* at 1285. The Court rejected the argument that applying the "abstractly just doctrine of mitigation" would be too burdensome, stating that "the advantages of a simple rule must be balanced against the importance of taking fair account, in a civilized legal system, of every socially desirable factor in the final judgment." *Id.*

We note that provisions in New Jersey's Law Against Discrimination with respect to back pay are virtually identical to New York's anti-discrimination law, *N.Y.Exec.Law* § 290 *et seq.* (McKinney 1972 & Supp.1979), adopted one month before the

New Jersey statute. See 68 *N.J.L.J.* 219 (1945); *Department of Education, Division against Discrimination, Annual Report* (July 1, 1945 to June 30, 1946). Though its remedy section does not expressly require mitigation, the New York courts have applied mitigation principles. See *State Division of Human Rights v. Board of Education of Niagara Falls*, 59 *A.D.2d* 1048, 399 *N.Y.S.* 2d 805 (App.Div.1977); *121–129 Broadway Realty, Inc. v. State Division of Human Rights*, 48 *A.D.2d* 975, 369 *N.Y.S.2d* 837 (App.Div.1975), mod. on other grounds, 49 *A.D.2d* 422, 376 *N.Y.S.2d* 17 (App.Div.1975).

■■■ Mitigation depends upon the facts of the case. If the claimant has actually obtained other employment, it is simple enough to credit the employer with the amount of those earnings. Beyond that, there are several complications. In order to invoke mitigation there must, of course, be available jobs. In their absence, mitigation is not feasible. Further, if positions are available, mitigation will apply if the claimant has not made a reasonable and diligent effort to obtain other employment. It is possible that even though such an effort was made, the claimant may not have been successful finding work. In that situation mitigation would not be appropriate.

■■■ Another factor which must be considered is the nature of the other positions available. It has been held in a breach of employment contract context that mitigation depends on the time lost "before similar employment can be obtained by using proper diligence." *Larkin v. Hecksher*, 51 *N.J.L.* at 138; Annotation, "Nature of alternative employment which employee must accept to minimize damages for wrongful discharge," 44 *A.L.R.* 3d 629, 641–643 (1972). Similar employment refers to the nature of the activity, location and rate of compensation.

The first characteristic, the nature of the work, involves flexibility. Professor Corbin in his treatise on contracts recites:

The employee, instead of remaining idle, is expected to get other service of a *like* character if he can do so by making a reasonable amount of effort. [5 A. Corbin, *Corbin on Contracts* § 1095 at 516 (1964); emphasis supplied]

What employment is "of a like character" should be determined by analyzing the particular responsibilities and skills of the job the person was denied. Thus, for example, an executive secretary in a shoe manufacturing company may be deemed to have accepted a comparable position, if one becomes available, not only in other manufacturing or commercial enterprises, but also in noncommercial enterprises. In the case of an unskilled worker, the range of comparability may be even greater than it would be for a skilled or managerial employee. Employment which is unsuitable and demeaning when compared with the job to which the individual was entitled is not comparable. Furthermore, in addition to the nature of the work, comparability of job location and amount of pay may be considered as well. Thus it may be unreasonable to apply mitigation principles when the available job would require the applicant to move his home or to accept a substantial reduction in pay.

An analogous situation exists under New Jersey's Unemployment Compensation Law, *N.J.S.A.* 43:21–1 *et seq.,* which provides that a claimant is disqualified for unemployment benefits if he does not accept available suitable work. The statutory guideline states that

> In determining whether or not any work is suitable for an individual, consideration shall be given to the degree of risk involved to his health, safety and morals, his physical fitness and prior training, his experience and prior earnings, his length of unemployment and prospects for securing local work in his customary occupation, and the distance of the available work from his residence. [*N.J.S.A.* 43:21–5(c)(1)]

In applying the criteria it has been held that employment involving a 50% pay reduction, manual labor and health risks is not "suitable" for a former manufacturing engineer, *Wojcik v. Board of Review*, 58 *N.J.* 341 (1971), employment in a less skilled factory position with a 25% pay reduction is not "suitable" for a skilled factory worker, *Johns-Manville v. Board of Review*, 122 *N.J.Super.* 366 (App.Div.1973), and employment as a retail clerk is "suitable" for a former retail clerk seeking a higher paying factory position, *W.T. Grant Co. v. Board of Review*, 129 *N.J.L.* 402 (Sup.Ct.1943). See generally Menard, "Refusal of Suitable Work," 55 *Yale L.J.* 134 (1945).

However, the degree of comparability required is not static. With the passage of time circumstances may dictate that the claimant lower his sights and accept employment with lower pay, with different work, or at a more distant location.

This notion of lower sights has been applied when determining mitigation with respect to back pay awards under the NLRA. In *NLRB v. Southern Silk Mills, Inc.*, 242 *F.*2d 697 (6 Cir. 1957), *cert.* den. 355 *U.S.* 821, 78 *S.Ct.* 28, 2 *L.Ed.*2d 37 (1957), two employees had been illegally discharged in May 1951 and had obtained no employment between that date and their order of reinstatement in December 1953. At the back pay hearing, the trial examiner ruled that after the employees had searched for comparable work over a period of several months, they should have sought lower paying positions, "which, although not 'desirable' from the salary standpoint, would have been satisfactory employment for one of their training, experience and background." 242 *F.*2d at 699. The examiner did not think this mitigation requirement should be imposed earlier, since an employee who immediately accepted a lower salary would be charged with a failure to exercise proper diligence in mitigation. *Id.* The Board rejected the examiner's ruling and awarded back pay without reduction. The Court of Appeals denied enforcement of the Board's order and remanded for an additional hearing, stating:

> We are of the opinion . . . that the usual wage earner, reasonably conscious of the obligation to support himself and his family by suitable employment, after inability over a reasonable period of time to obtain the kind of employment to which he is accustomed, would consider other available, suitable employment at a somewhat lower rate of pay 'desirable new employment.' . . . The failure of these two employees, under the conditions existing in the present case, to seek or take other suitable, available employment, although at a lower rate of pay, over a period of approximately three years, constitutes to some extent at least loss of earnings 'willfully incurred.' [242 *F.*2d at 700]

The lower sights doctrine has been applied with respect to the nature of the work. For example, in *NLRB v. Moss Planing Mill Co.*, 224 *F.*2d 702 (4 Cir. 1955), the court held a semi-skilled worker in a lumber mill should have accepted agricultural work in view of his prior experience as a farm worker. A decision to

the same effect is *NLRB v. Madison Courier, Inc.*, 505 *F.*2d 391 (D.C.Cir.1974), where, in considering mitigation with respect to back pay for employees who were printers for the defendant newspaper, the court held they were entitled to confine their search to the printing industry for a reasonable period of time. Once it became apparent that no printing jobs were available in the area, they should have expanded their search outside the printing field. *Id.* at 402. The court concluded that a printer "may not cavalierly ignore the existence of non-printing work which is no more dangerous or distasteful or essentially different from his regular job and which is suitable to his background and experience." *Id.* at 398. See *Shell Oil Co.*, 218 *NLRB* 87 (1975) (surveyor with 14 years experience as pipefitter should not have quit interim employment as pipefitter); *Knickerbocker Plastic Co.*, 132 *NLRB* 1209 (1961) (plastics molder with 12 years experience as captain of waiters should have sought employment in latter occupation). For other cases that have in effect applied the lower sights principle see *Perry v. Simpson Waterproof Manufacturing Co.*, 37 *Conn.* 520, 540 (1871); *Torson Construction Co. v. Grant*, 251 *Ky.* 800, 66 *S.W.*2d 79, 82 (1933); *Hoover v. Citizens Home Bank*, 245 *S.W.*2d 154, 157 (Mo.App. 1951); *Copeland v. Hill*, 126 *S.W.*2d 567, 569 (Tex.Civ.App.1939); *San Antonio & A. P. Ry. Co. v. Collins*, 61 *S.W.*2d 84, 89 (Tex.App.1933); *Buffalo Bayou Co. v. Lorentz*, 177 *S.W.* 1183, 1185 (Tex.Civ.App.1915).

This principle of lower sights has also been applied under New Jersey's Unemployment Compensation Law. See, *e. g., De Rose v. Board of Review*, 6 *N.J.Super.* 164 (App.Div.1950) (claimant, who sought employment at previous pay level, denied benefits after two months when she should have realized former salary was unavailable); *Worsnop v. Board of Review*, 92 *N.J.Super.* 260 (App.Div.1966) (seaman required to seek employment outside shipping industry immediately since ongoing strike effectively precluded job openings in that line).

 If, after a reasonable amount of time, an employee has been unable to secure closely comparable employment, available employment may be determined by expanding the type of service sought, provided he is suited, or by reducing the salary demanded, or by enlarging the geographical area in which the individual should accept employment. The lower sights principle, however, should not be automatically applied. Its applicability depends not only on the passage of a reasonable period of time, but also on the circumstances peculiar to the individual involved. These circumstances include the other skills or qualifications possessed by the applicant and whether the employee's family status reasonably justifies enlarging the work locale. Other considerations are the amount of the salary reduction, the type of alternative employment, and the impact these factors may have on the individual's future. The lower sights principle is to be applied with caution—for measured against the policy of promoting production and employment is the counter policy of righting the wrong attributable to an unlawful discrimination.[3]

 Mitigation, including the lower sights principle, is an affirmative defense and the burden of proving the appropriateness of its application rests on the wrongdoer, in this case the employer.[4] *Sandler v. Lawn-A-Mat Chemical & Equipment Corp.,* 141 *N.J.Super.* 437, 455 (App.Div.1976), certif. den. 71 *N.J.* 503 (1976); *Roselle v. La Fera Contracting Co.,* 18 *N.J.Super.* 19, 28 (Ch.Div.1952); 5 *A. Corbin, Corbin on Contracts* § 1039 at 251

---

[3]We note that an employee who lowers his sights too soon by accepting lower paying work may be subject to a reduction in an amount equivalent to that which he should have accepted. See *NLRB v. Madison Courier, Inc.,* 472 *F.*2d 1307 (D.C.Cir.1972), on remand 202 *NLRB* 115 (1973), enforcement den. 505 *F.*2d 391 (D.C.Cir.1974). In this regard, courts should be particularly careful to resolve doubts in favor of the employee.

[4]Similarly, under the Civil Rights Act of 1964 the employer has the burden of proving that the employee did not mitigate his loss. 42 *U.S.C.* § 2000e–5(g); see, *e. g., Kaplan v. International Alliance of Theatrical & Stage Employees,* 525 *F.*2d 1354, 1363 (9 Cir. 1975); *Hegler v. Board of Education,* 447 *F.*2d 1078, 1081 (8 Cir. 1971).

(1964). *Cf. Sommer v. Kridel*, 74 *N.J.* 446, 457 (1977) (burden on landlord to prove he exercised reasonable diligence in attempting to re-let premises). The employer may establish a prima facie case by first showing that comparable employment opportunities were available and, if the lower sights doctrine is applicable, that there were other suitable jobs. The burden of going forward would then shift to the employee who may introduce evidence that comparable employment did not exist, that reasonable and diligent efforts on his part had not been successful, or that the circumstances did not justify acceptance of a dissimilar job. Whether the individual sought a job or not would be irrelevant in the absence of the existence of a position. *Contra, NLRB v. Madison Courier*, 472 *F.2d* 1307, 1319 (D.C.Cir. 1972), on remand 202 *NLRB* 115 (1973), enforcement den. 505 *F.* 2d 391 (D.C.Cir.1974); *Falls Stamping & Welding Co. v. International Union*, 485 *F.Supp.* 1097, 1145 (N.D.Ohio 1979). So, if the proofs show that jobs were not available, mitigation would not be in order. Assuming jobs were available, if the complainant had unsuccessfully expended reasonable efforts and lowered his sights, if appropriate, no reduction in the back pay award would be warranted. The ultimate burden of persuasion rests on the employer.[5]

In this case the director and hearing examiner found that complainant had made an adequate effort to mitigate the damages. The Appellate Division found nothing in the record to suggest that any of the available employment was "unsuitable in terms of the nature and duties of such employment and the complainant's background, training and experience." It also held that she rejected opportunities because "she would not consider accepting a job which paid less than $135 a week."

---

[5]To the extent that *Talman v. Board of Trustees*, 169 *N.J.Super.* 535 (App.Div.1979), certif. den. 81 *N.J.* 407 (1979), requires that a discriminatee exercise reasonable efforts although there are no comparable positions available and imposes the burden of proving mitigation or a failure to mitigate on both the employer and discriminatee, it is rejected.

The evidence before the hearing examiner reveals that between July 1975 and August 1977, Miss Goodman made efforts to obtain employment and secured two temporary jobs and one permanent position paying slightly over $100 per week. During that time she also spurned a potential offer of $150 per week and for at least some period did not investigate positions paying less than $135 per week. Whether she should have reasonably lowered her sights in July 1975 by seeking a position paying $135 per week has never been determined. Furthermore, if that was unreasonable, there is no indication when her expectations should have changed. Her situation differs from that of a discharged employee in that the back pay is being keyed to a position she never held, whose duties and compensation were unknown to her. Accordingly, measuring the reasonableness of her search must start with her last employment in April 1975 when she was a district supervisor overseeing personnel hiring and training for 10 stores at a salary of $185 per week. By the latter part of July she was willing to accept $175 per week and sales-oriented work. Holding that she should have accepted a position paying $135 per week at that time is not justified on this record.

The Division on Civil Rights awarded complainant $175 per week plus 8% interest per annum from the date of the discrimination on July 28, 1975 until December 31, 1977. It used that cutoff date because in the calendar year 1978 Miss Goodman earned an annual salary in excess of the amount she would have been paid as a field representative. The Appellate Division correctly recognized the complainant's right to back pay should have terminated in August 1977 when she became employed in an equivalently paying position.

No one questions the proposition that there should be deducted from the back pay award amounts that Miss Goodman actually earned during the period in question. The Appellate Division, in addition to subtracting $135 per week on the theory that she should have accepted a job paying that amount, also

deducted the sums actually earned. Respondents conceded at oral argument that the double deduction was improper. The appropriate deduction should have been the greater of the actual earnings or the salary she should have been earning.

The matter is remanded to the Division to permit the parties to produce additional evidence with respect to the mitigation issues and on the basis of the record as supplemented to make findings of facts and conclusions of law with respect to the availability of comparable employment, the applicability of a lower sights doctrine, the period during which back pay should be awarded, and the computation of the amount due the claimant. In all other respects the award is affirmed. We do not retain jurisdiction.

*For modification and affirmance* —Chief Justice WILENTZ and Justices SULLIVAN, PASHMAN, CLIFFORD, SCHREIBER, HANDLER and POLLOCK—7.

*For reversal* —None.