207 N.J. Super. 145 (1986)
504 A.2d 53
JON SLOHODA, PLAINTIFF-APPELLANT,
v.
UNITED PARCEL SERVICE, INC., ET ALS., DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Submitted December 17, 1985.
Decided February 5, 1986.
*147 Ball, Hayden, Kiernan, Livingston & Smith, attorneys for appellant (Nancy Erika Smith, on the brief).
Pitney, Hardin, Kipp & Szuch, attorneys for respondents (Prosukauer Rose Goetz & Mendelsohn, of the New York Bar, admitted pro hac vice, Howard L. Ganz on the brief).
Before ANTELL, SHEBELL and MUIR, JJ.
The opinion of the court was delivered by, ANTELL, P.J.A.D.
This suit was brought under the Law Against Discrimination, N.J.S.A. 10:5-12a, upon a claim that plaintiff was discriminatorily discharged from employment because of his status as a married person. Defendants are plaintiff's former employer, United Parcel Service, Inc. ("UPS"), and its managerial personnel who were responsible for terminating plaintiff's employment. The earlier history of the case is related in our previous decision wherein we reversed an order for summary judgment in favor of defendants. 193 N.J. Super. 586 (App.Div. 1984). Following our remand defendants again moved for summary judgment. That motion was denied by the trial court and the *148 case thereafter proceeded to trial. Plaintiff now appeals from an order of involuntary dismissal entered under R. 4:37-2(b) after the presentation of his evidence.
Broadly stated, plaintiff contends that defendants fired him because he, although married to someone else, was cohabiting with Patricia Arnett, another UPS employee.[1] Plaintiff asserts that his marital status was a material factor in the termination of his employment and that defendants would not have taken this action had he been unmarried. Defendants acknowledge discharging plaintiff, but maintain that they did so because of misconduct in plaintiff's job performance and not because of his marital status.
Believing that such action was mandated by our previous opinion, the trial court granted defendants' motion based upon plaintiff's failure to prove that other male and female unmarried UPS employees were permitted to cohabit without interference. Our intention in this regard was misconstrued.
In our previous opinion we made the following statement of plaintiff's contentions:
Plaintiff's claim essentially is that he was discharged because he was a married man who had a sexual liaison with a woman other than his wife. He alleges that his services would not have been terminated by defendant if he had been unmarried. Thus, his contention is that the company policy was that any married management employee who engaged in sexual activity out of wedlock would be discharged, but that any unmarried management employee who engaged in sexual activity would not be discharged. [Slohoda v. United Parcel Serv., Inc., 193 N.J. Super. 586, 589 (App.Div. 1984).]
We categorically held "that if an employer's discharge policy is based in significant part on an employee's marital status, a discharge resulting from such policy violates N.J.S.A. 10:5-12a." Id. at 590. The question presented, therefore, is whether the firing was materially grounded in an invidious reason, that is, the fact of his marriage to someone else while maintaining a relationship with Arnett. Plaintiff was free to prove this claim by whatever evidence was available to him. While a showing of differential treatment accorded other employees who were single might be one way of proving such discrimination, it is not exclusive. Nothing stated in our previous opinion suggests that plaintiff should be denied redress absent proof of other actual instances in which unmarried employees in like circumstances were treated differently than plaintiff.
Although the reason given by the trial court for the action under review was erroneous, defendants contend that the judgment of dismissal should be nevertheless affirmed because *149 plaintiff's proofs were inadequate under standards otherwise applicable in discrimination cases. The relevant parts of the record consist of plaintiff's direct and cross-examination and selected portions of depositions taken on oral examination of UPS's management personnel who are also named as defendants in the action.
Plaintiff began his employment as a delivery truck driver with UPS in 1972 and was married that same year. In 1975 he was elevated to the position of supervisor at the Englewood Center building, and a year and a half later was promoted to manager of the Spring Valley building. In 1979 he became manager of the Bernardsville delivery center. It therefore appears that his job performance up to the time of the events in question was regarded by defendants as highly satisfactory in all respects.
In 1975 and 1976 his marriage ran into difficulties. Shortly after he became the Bernardsville Center manager plaintiff came into contact with Patricia Arnett who was a package delivery driver working under his supervision. An intimate relationship developed in the summer of 1980 and in January 1981 plaintiff left his wife and began to live with Ms. Arnett. Plaintiff knew of the company policy against employment by UPS of both husband and wife. This rule required that where a marriage occurred between coemployees, one of the two was obliged to resign. There was also in force a policy against fraternization between management personnel, which included plaintiff, and other employees, such as Arnett.
In June 1981 plaintiff and Ms. Arnett were asked by division manager James Barry, who was plaintiff's supervisor, to meet in Smithfield Park in Parsippany with him and William Balser, the personnel manager of the North Jersey district. According to plaintiff, both Barry and Balser pointedly inquired into the status of his relationship with Arnett and expressed their dissatisfaction that plaintiff and Arnett were living together. During the discussion plaintiff named other coemployees who had "dated UPS girls" and said that he could not understand why his situation was being treated differently. In reply, Balser made the statement which lies at the heart of plaintiff's case. He said that the difference between plaintiff and the other employees was that they were "single folks" and plaintiff was a married man. Although plaintiff reasoned that he had then been separated from his wife for six months, Balser remained committed to the view that plaintiff "was a married man and they were single and that was the only difference." This conversation is admitted by Balser. Although Barry and *150 Balser tried to persuade plaintiff or Arnett to resign, they refused to do so and both returned to their employment.
Following the meeting in Smithfield Park plaintiff became conscious of a difference in the treatment accorded him during working hours. He testified that he was shunned by his co-workers and that Barry, with whom he had previously been on good terms, would sit in plaintiff's office and stare at him for 30 to 45 minutes at a time without speaking except to make critical remarks and refer to him as "Slohodovitch."
In July 1981 plaintiff was told by Barry that he was being transferred to the Dover Center in the western division of the northern district. Although his salary and fringe benefits remained the same, plaintiff was told the position would involve less responsibility. Barry also stated that until plaintiff "cleaned up the mess" between Arnett and himself that he would not be eligible for promotion or for a more responsible job. He further told plaintiff that higher management had considered firing plaintiff but decided that it "would be too embarrassing for the company to do that." That this option was discussed is confirmed by the deposition testimony of Richard Boland, defendant's northern district manager. Barry also expressed his misgivings that plaintiff had thrown away his "entire career for love of a woman."
Plaintiff testified that he found himself in a "hostile" atmosphere in Dover. Whereas there had previously been warmth and congeniality, he was now being subjected to a pattern of abuse and harassment and plaintiff furnished factual instances to illustrate this point.
On November 9, 1981 plaintiff was called into the office of Robert McGuire, division manager of the western division of the northern district and plaintiff's immediate superior, and was confronted with a number of drivers' time cards which bore altered entries. Plaintiff insisted that the alterations were not made by him and that he had no knowledge as to who might be responsible. McGuire thereupon told plaintiff that he was fired. Plaintiff's desk was cleaned out, his uniform and keys were turned in and he was personally escorted outside the building into the parking lot.
Some days later plaintiff was called into the office of Richard Boland for further questioning. The meeting was also attended by McGuire, Balser and the manager of the UPS industrial engineering department, Dennis O'Toole. Plaintiff was again asked why he had falsified the time cards and he replied as he had before. He was then told by Boland that he was terminated *151 and given a clearance slip which stated that the reason for termination was "falsification of records and lack of integrity." Underneath, in parentheses and in different handwriting, also appears "violation of company policy." Barry acknowledged in his deposition that after the meeting in Boland's office he "may have" told other company personnel that the "Jon and Patty problem" had been eliminated.
This proceeding was brought under the New Jersey Law Against Discrimination which provides, so far as pertinent, at N.J.S.A. 10:15-12a:
It shall be an unlawful employment practice, or, as the case may be, an unlawful discrimination: a. For an employer, because of the ... marital status . .. of any individual ... to discharge from employment such individual....
The standards governing the application of this statute were formulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). See Goodman v. London Metals Exchange, Inc., 86 N.J. 19, 31 (1981); Peper v. Princeton University Board of Trustees, 77 N.J. 55, 82 (1978). The prescribed methodology requires that plaintiff first carry the burden of demonstrating a prima facie case. If this is done, the burden then shifts to the employer "to articulate some legitimate, nondiscriminatory reason" for terminating plaintiff's employment. McDonnell Douglas, supra, 411 U.S. at 802, 93 S.Ct. at 1824. Thereafter, plaintiff is to be afforded a "fair opportunity" to show that defendants' stated reason for terminating employment was in fact a pretext. Id. at 804, 93 S.Ct. at 1825.
Defendants first contend that plaintiff failed to meet his initial burden of presenting prima facie evidence that he was discharged because of his marital status. As to this, the pivot of plaintiff's case is the Smithfield Park meeting of June 1981. It was then that Balser, UPS's district personnel manager, explicitly differentiated plaintiff's relationship with Arnett for the reason that plaintiff was a married man whereas other employees who had fraternized were not. Despite plaintiff's attempts to dissuade Balser from this point of view, it remained central to Balser's assessment of the situation. Although defendants *152 argue that plaintiff's situation is further distinguishable in that the other employees had not been living together, this was not the distinction made by Balser at the time. His focus was on plaintiff's marital status, and although a jury may conclude otherwise after hearing defendants' evidence, this much is clearly inferable from the evidence thus far adduced.
Although defendants did not terminate plaintiff's employment immediately after the park meeting because it would have been "too embarrassing" to the company, they considered doing so. Instead, plaintiff was laterally moved to a position in another division where he was given less responsibility, and he was told that he would not be eligible for a promotion until "the mess" between himself and Arnett was cleaned up. Also to be considered as evidencing defendants' basic antipathy to the adulterous nature of the relationship between plaintiff and Arnett are the statements made by Barry that plaintiff had thrown away his "entire career for love of a woman" and that the "Jon and Patty problem" had been eliminated by discharging plaintiff.
The separation of five months between the two does not preclude a reasonable inference that defendants' final decision to terminate plaintiff in November 1981 was referable to the discriminatory reason enunciated by Balser in June 1981. In light of the intervening events that we have noted, together with Balser's presence at the meeting in Boland's office when plaintiff was given his clearance slip, and the fact that everyone at that meeting knew of plaintiff's relationship with Arnett, such an inference is permissible.
As the court in Dolson v. Anastasia, 55 N.J. 2, 5-6 (1969) stated, in considering a motion for involuntary dismissal "[t]he trial court is not concerned with the worth, nature or extent (beyond a scintilla) of the evidence, but only with its existence, viewed most favorably to the party opposing the motion." The test is whether
"the evidence, together with the legitimate inferences therefrom, could sustain a judgment in * * * favor" of the party opposing the motion, i.e., if, accepting as true all the evidence which supports the position of the party defending *153 against the motion and according him the benefit of all inferences which can reasonably and legitimately be deduced therefrom, reasonable minds could differ, the motion must be denied. [Id. at 5].
Under the foregoing criteria, we conclude that a prima facie case was made out.
Defendants' other contention is that the facts concerning the falsification of time cards were conceded by plaintiff on cross-examination, and that in this manner they satisfied their burden of "articulating" a legitimate, nondiscriminatory reason for the firing. Thus, their argument continues, the presumption of discrimination arising from the prima facie case is conclusively rebutted and no question of fact remains for jury consideration.
We note first that plaintiff neither conceded any of the facts relating to the falsification of records nor testified to a valid reason for his firing. He merely related the self-serving accusations and statements made by McGuire and Boland during the meeting of November 1981; in fact, plaintiff vehemently denied having anything to do with falsifying the records and claimed to know nothing about this. Surely, he could not then cross-examine defendants to learn their real motivation, and in our view to allow an employer to meet its burden of rebutting a prima facie case of discrimination merely by relying upon the reason given to the employee for the firing would defeat the intent of the McDonnell Douglas procedure that plaintiff be allowed a "fair opportunity" to show that the articulated reason was in fact a pretext.
While it is true that the employer's duty to "articulate" a legitimate, nondiscriminatory reason for the firing does not oblige it to persuade a court that it was actually motivated by the proffered reasons, it must at least raise "a genuine issue of fact as to whether it discriminated against the plaintiff." Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981). This cannot be accomplished where, as in this case, there has been no showing of the evidence on which defendants have acted. Without at least this much plaintiff cannot cross-examine as to whether the *154 given reason for the firing is pretextual, and the good faith of defendants' belief in their alleged reason for firing plaintiff therefore remains untested.
In our view, moreover, defendants misconceive the procedural roles of the prima facie case and the articulated legitimate nondiscriminatory reason in the McDonnell Douglas methodology. This is elucidated in Texas Dept. of Community Affairs v. Burdine, supra, in the following way:
Establishment of the prima facie case in effect creates a presumption that the employer unlawfully discriminated against the employee. If the trier of fact believes the plaintiff's evidence, and if the employer is silent in the face of the presumption, the court must enter judgment for the plaintiff because no issue of fact remains in the case.
The burden that shifts to the defendant, therefore, is to rebut the presumption of discrimination by producing evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason. The defendant need not persuade the court that it was actually motivated by the proffered reasons. * * * It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff. To accomplish this, the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection. [Footnote omitted]. The explanation provided must be legally sufficient to justify a judgment for the defendant. If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted, and the factual inquiry proceeds to a new level of specificity. Placing this burden of production on the defendant thus serves simultaneously to meet the plaintiff's prima facie case by presenting a legitimate reason for the action and to frame the factual issue with sufficient clarity so that the plaintiff will have a full and fair opportunity to demonstrate pretext. [450 U.S. at 254-256, 101 S.Ct. at 1094-1095].
The net effect of an articulated legitimate, nondiscriminatory explanation is "to meet the plaintiff's prima facie case," that is, to create a question of fact for a jury as to whether the firing was discriminatory, thereby avoiding the "legally mandatory inference of discrimination arising from the plaintiff's evidence." Id. at 255, n. 10, 101 S.Ct. at 1095, n. 10. The explanation does not, whether shown on plaintiff's or defendants' case, conclusively resolve the issue in defendants' favor, for plaintiff's prima facie

*155 evidence and inferences properly drawn therefrom may be considered by the trier of fact on the issue of whether the defendant's explanation is pretextual. Indeed, there may be some cases where the plaintiff's initial evidence, combined with effective cross-examination of the defendant, will suffice to discredit the defendant's expalnation [sic]. [Id. at 255, n. 10, 101 S.Ct. at 1095, n. 10.]
Additionally, in carrying his burden of persuasion plaintiff is allowed
the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision. This burden now merges with the ultimate burden of persuading the court that [he] has been the victim of intentional discrimination. [He] may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence. [Id. at 256, 101 S.Ct. at 1095].
We gather from the record that the trial court was of the understanding that plaintiff was obligated to demonstrate the pretextual nature of defendants' explanation by offering further direct evidence to this effect. Plaintiff is not so limited, and may also argue the pretextual nature of the explanation from the evidence already before the court. The involuntary dismissal should not have been granted for the further reason, therefore, that from the record as it stood at the close of plaintiff's case, taking into account the lack of any investigation by defendants as to who was responsible for the falsification before accusing plaintiff, and plaintiff's denial of such responsibility, it was at least arguable from plaintiff's prima facie evidence, that the reason given by defendants to plaintiff for terminating his employment was disingenuous. In this connection it is pertinent to observe that for purposes of the Law Against Discrimination plaintiff need not prove that the termination was motivated solely by a discriminatory purpose. It is sufficient if, taken with other possibly meritorious reasons, the discriminatory purpose was "a determinative factor." Hagelthorn v. Kennecott Corp., 710 F.2d 76, 82 (2d Cir.1983).
Moreover, had the motion for involuntary dismissal been denied, as it should have been, and had defendants been required *156 to articulate its allegedly legitimate, nondiscriminatory explanation for the firing as part of their case in defense, plaintiff would have had the opportunity provided by McDonnell Douglas to further demonstrate the pretextual nature of the explanation. According to his claims this might have been attempted by developing proof through cross-examination to support his contentions as to the frailty of the evidence on which defendants acted, the trivial nature of the alleged falsification and the heavy-handedness of the penalty imposed relative to those imposed upon others for comparable infractions.
The case of Sime v. Trustees of Cal. State University & Colleges, 526 F.2d 1112 (9th Cir.1975), relied on by defendants, is distinguishable. The involuntary dismissal there under review was affirmed for two reasons. The first was that plaintiff had not presented to the trial court the question of her right to show the pretextual nature of defendants' proffered explanation for denying employment. This is not the case here.
The other reason was that defendants had met their burden of articulating some legitimate, nondiscriminatory reason for plaintiff's rejection "out of the mouths of [plaintiff's] own witnesses, by cross-examining them." Id. at 1114. This is stated in conclusory form and the opinion is silent as to any of the relevant circumstances so that we are unable to discern the form or nature of the proofs elicited by cross-examination to support the court's belief that a valid justification had been conclusively established. Here, we held that the material relied on by defendants to demonstrate their legitimate, nondiscriminatory reason do not rise to the level of what is required by McDonnell Douglas. Moreover, as we have said, even if it did, this does no more than create a fact question as to the reason for plaintiff's discharge.
The order for involuntary dismissal is vacated and the matter is remanded for retrial consistent with this opinion.
NOTES
[1] Plaintiff and Arnett are now married to each other.