

1994 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-17-1994

# McKenna, et al. v. Pacific Rail Service

Precedential or Non-Precedential:

Docket 93-5253, 93-5277

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1994

Recommended Citation

"McKenna, et al. v. Pacific Rail Service" (1994). *1994 Decisions.* Paper 115.
http://digitalcommons.law.villanova.edu/thirdcircuit_1994/115

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1994 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

Nos. 93-5253, 93-5277,
93-5385 and 93-5386

_____


PETER MCKENNA; GREG SPINA; JACK RICCIARDI; JOHN OLIVER;
    ANDREW HENNESSEY; AL ARMETTA; PINCUS COHEN; DAVE QUAID;
    ADAM LUKASWESKI; WILLIAM HARPER; DORRANCE A. LINDH;
    JOHN GUGLIOTTA; GEORGE WHITEHEAD; JOHN SHEA; ANTHONY
    NAZARE; ROBERT TIGHE; DENNIS MCCARTHY; RICHARD
    MONTACALVO; JEANETTE MCCAFFERTY; GEORGE MARTIN; RALPH
    FERNANDEZ; PAUL NOETHE; PATRICIA BURWITZ; MICHAEL
    DEMONE; EDDIE DECHERT; SALVATORE PETRUZZELLI; PHYLLIS
    LINDH; JOSEPH K. PFEIL,

                              vs.

PACIFIC RAIL SERVICE,

        Pacific Rail Service,

                         Appellant Nos. 93-5253
                             and 93-5385.


PETER MCKENNA; GREG SPINA; JACK RICCIARDI; JOHN OLIVER;
    ANDREW HENNESSEY; AL ARMETTA; PINCUS COHEN; DAVE QUAID;
    ADAM LUKASWESKI; WILLIAM HARPER; DORRANCE A. LINDH;
    JOHN GUGLIOTTA; GEORGE WHITEHEAD; JOHN SHEA; ANTHONY
    NAZARE; ROBERT TIGHE; DENNIS MCCARTHY; RICHARD
    MONTACALVO; JEANETTE MCCAFFERTY; GEORGE MARTIN; RALPH
    FERNANDEZ; PAUL NOETHE; PATRICIA BURWITZ; MICHAEL
    DEMONE; EDDIE DECHERT; SALVATORE PETRUZZELLI; PHYLLIS
    LINDH; JOSEPH K. PFEIL,

                              vs.

PACIFIC RAIL SERVICE,

       Peter McKenna; Greg Spina; Jack Ricciardi; John Oliver;
       Andrew Hennessey; Al Armetta; Pincus Cohen; Dave Quaid;
       Adam Lukasweski; William Harper; Dorrance A. Lindh;
       John Gugliotta; George Whitehead; John Shea; Anthony
       Nazare; Robert Tighe; Dennis McCarthy; Richard
       Montacalvo; Jeanette McCafferty; George Martin; Ralph
       Fernandez; Paul Noethe; Patricia Burwitz; Michael
       Demone; Eddie Dechert; Salvatore Petruzzelli; Phyllis
       Lindh; Joseph K. Pfeil,

<u>Appellants Nos. 93-5277
and 93-5386</u>.

_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

(D.C. Civil No. 91-00693)

_____

ARGUED MARCH 10, 1994

BEFORE:  MANSMANN and LEWIS, <u>Circuit</u> <u>Judges</u>,
and MCKELVIE, <u>District</u> <u>Judge</u>.[*]

(Filed August 11, 1994)

_____

John W. Kyle
Roger D. Meade
Littler, Mendelson, Fastiff, Tichy, & Mathiason
World Trade Center, Suite 1653
Baltimore, MD  21202-3005

_____

[*]    Honorable Roderick R. McKelvie, United States District Judge
    for the District of Delaware, sitting by designation.

Gary P. Scholick (ARGUED)
Littler, Mendelson, Fastiff, Tichy & Mathiason
650 California Street, 20th Floor
San Francisco, CA  94108

<u>Attorneys for Appellant/Cross-appellee, Pacific Rail Service</u>


Louie D. Nikolaidis
Thomas M. Kennedy (ARGUED)
Lewis, Greenwald, Kennedy, Lewis,
 Clifton & Schwartz
355 Murray Hill Parkway
East Rutherford, NJ  07073

<u>Attorneys for Appellees/Cross-appellants, McKenna, Spina,
     Ricciardi, Oliver, Hennessey, Armetta, Cohen, Quaid,
     Lukasweski Harper, Lindh, Gugliotta, Whitehead, Shea,
     Nazare, Tighe, McCarthy, Montacalvo, McCafferty,
     Martin, Fernandez, Noethe, Burwitz, Demone, Dechert,
     Petruzzelli, Lindh, and Pfeil</u>


———————

OPINION OF THE COURT
———————


LEWIS, <u>Circuit</u> <u>Judge</u>.

Appellees/cross-appellants are 23 of 28 former yard and clerical employees of Pennsylvania Truck Lines, Inc. ("PTL") who asserted that appellant/cross-appellee Pacific Rail Services ("Pacific Rail") engaged in age discrimination in violation of the New Jersey Law Against Discrimination (the "LAD") by failing to hire them in 1990.  Since the trial in this case, the United States Supreme Court has issued a decision clarifying the standards by which federal employment discrimination cases are to be judged. <u>St. Mary's Honor Ctr. v. Hicks</u>, 113 S. Ct. 2742 (1993).  Because we believe the New Jersey Supreme Court would adopt <u>Hicks</u>'s

clarification of the test to be applied in federal discrimination cases in interpreting the LAD, we will vacate the judgment that was entered and remand for a new trial. To assist the district court on remand, we will also decide several subsidiary issues relating to individual claims and plaintiffs.

## I.

Because our resolution of the legal issues will require a new trial, it is not necessary to discuss the facts in great detail. The following, however, provides some background to the dispute. Beginning in 1960, PTL performed lift operations -- loading and unloading freight from flat bed railroad cars -- for Consolidated Rail Corporation ("Conrail") at its North Bergen, New Jersey, terminal. In July, 1990, however, after solicitation of bids by Conrail, Pacific Rail won the North Bergen contract, effective September 1, 1990.

Upon learning that PTL had lost the North Bergen contract, PTL employees at the North Bergen terminal became interested in working for Pacific Rail at that site. Pacific Rail representatives testified at trial, however, that even before submitting its bid, Pacific Rail had decided not to simply hire all of the PTL/North Bergen yard and clerical workers "wholesale," because Pacific Rail was concerned about the attitudes and work habits of some of the workers.[1]

---

[1]. Plaintiffs at trial disputed both the sincerity of Pacific Rail's concern and the accuracy of Pacific Rail's characterization of the PTL employees at North Bergen.

Instead, upon winning the North Bergen contract, Pacific Rail apparently undertook a three-step hiring process. First, Pacific Rail offered positions to its own employees at Conrail's Elizabeth, New Jersey ("E-Rail") terminal on a "promote from within" theory. (Pay rates at North Bergen were higher than at E-Rail, so a move to North Bergen was effectively a promotion, according to the Pacific Rail representatives.) Testimony indicated that one of the six yard and clerical employees transferred from E-Rail on this basis was over 40 years old. Pacific Rail next offered employment to three Conrail clerks and two PTL employees from the nearby Conrail/PTL terminal at Kearny, New Jersey. The three Conrail offerees (only two of whom accepted their offers) were over 40. The two PTL offerees (both of whom accepted) were under 40.

Finally, Pacific Rail hired all 11 applicants referred by the union local that represented yard and clerical employees at E-Rail. Of these, one was over 40.

As of September 1, only a limited number of positions in North Bergen remained open. Pacific Rail apparently offered employment to two former PTL/North Bergen yard employees who were over 40, but both refused the offer. Then a former PTL supervisor working for Pacific Rail recommended for hire four former PTL/North Bergen yard employees, two of whom were in their 20s and two of whom were over 40. Pacific Rail offered employment to the younger two, and they accepted. To fill a remaining clerk position, Pacific Rail made offers to two former PTL/North Bergen clerical employees, both over 40, but both declined. Ultimately,

instead of simply filling the clerk position, Pacific Rail transferred a person who was over 40 from E-Rail to assist with clerical work and act as office manager.

To summarize, prior to September 1, Pacific Rail had apparently hired 21 employees, none of whom came from the pool of PTL employees at North Bergen. Only four of these 21 individuals were over 40 years old. After September 1, Pacific Rail hired either three or four more employees, at least two of whom were under 40 and from PTL/North Bergen and at least one of whom was over 40 and formerly with E-Rail.[2] Thus, of the 25 yard and clerical employees that the evidence showed Pacific Rail hired to work at North Bergen, either 19 or 20 were under 40 years old. The 28 former PTL/North Bergen yard and clerical employees who filed this lawsuit were over 40. They alleged that Pacific Rail's failure to hire them was due to age discrimination in violation of the LAD. A jury found in favor of 18 of the 28 employees and awarded them a total of more than $7 million ($1,448,000 in back pay and $5,743,500 in front pay). Both Pacific Rail and the 18 verdict winners, plus five plaintiffs whose claims were dismissed by the district court, appeal and cross-appeal several issues.

---

[2]. Curiously, the record is somewhat ambiguous as to whether three or four additional employees were hired after September 1. Plaintiffs' Exhibit 10 indicates that Pacific Rail hired a total of 25 persons. The parties agree that 21 were hired prior to September 1. That would leave four to be hired after September 1, but, as discussed in the text, the parties specifically discuss only three employees hired after that date. The discrepancy is immaterial for our purposes, as we are certain it will be clarified on remand.

II.

The primary issue presented involves the delicate task of predicting how the New Jersey Supreme Court would interpret and apply the LAD in the aftermath of the United States Supreme Court's decision in St. Mary's Honor Ctr. v. Hicks, 113 S. Ct. 2742 (1993). As a federal court sitting in diversity, the district court was, and we are, obliged to apply state substantive law. Erie R.R. Co. v. Tompkins, 304 U.S. 64 (1938); Colantuno v. Aetna Ins. Co., 980 F.2d 908, 909 (3d Cir. 1992). In so doing, we are not free to impose our own view of what state law should be; we are to apply state law as interpreted by the state's highest court. Id. In the absence of guidance from that court we are to refer to decisions of the state's intermediate appellate courts for assistance in determining how the highest court would rule. Fleck v. KDI Sylvan Pools, Inc., 981 F.2d 107, 113 (3d Cir. 1992); Fisher v. USAA Casualty Ins. Co., 973 F.2d 1103, 1105 (3d Cir. 1992). In cases such as this, where neither the state supreme court nor any intermediate appellate courts have spoken to the issue at hand, our task of predicting state law becomes even more complicated. Nevertheless, we must proceed into these uncharted waters, using pronouncements from the New Jersey Supreme Court on analogous issues as our compass.

A.

In Hicks, the Supreme Court considered "whether, in a suit against an employer alleging intentional racial discrimination in violation of [Title VII], the trier of fact's rejection of the employer's asserted reasons for its actions mandates a finding

for the plaintiff."  Hicks, 113 S. Ct. at 2746.  Under the familiar McDonnell Douglas shifting-burden analysis applicable to federal employment discrimination cases involving indirect proof of discrimination, the plaintiff bears the burden of proving a relatively simple prima facie case, which the employer must rebut by articulating a legitimate, non-discriminatory reason for its actions.  See generally Chipollini v. Spencer Gifts, Inc., 814 F.2d 893, 897 (3d Cir. 1987).[3]  Prior to Hicks, we had held that a finding that a defendant employer had articulated false reasons mandated entry of judgment for plaintiff.  See Chipollini, 814 F.2d at 898; Duffy v. Wheeling Pittsburgh Steel Corp., 738 F.2d 1393, 1395-96 (3d Cir. 1984).  Hicks changed that:  the Court ruled definitively that a finding that an employer had articulated a pretextual reason for its actions does not mandate judgment for a plaintiff.  Instead, "a reason cannot be proved to be `a pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason."  Hicks, 113 S. Ct. at 2752.  Thus, "[t]hat the

_____

[3]. The McDonnell Douglas analysis was derived from McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  See also Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248 (1981).  Although McDonnell Douglas itself involved allegations of intentional (disparate treatment) discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, the shifting burden analysis with which the case name is now synonymous also has been applied in section 1983 cases, section 1981 cases and age discrimination cases.  See Hicks, 113 S. Ct. at 2746-47 n.1; Seman v. Coplay Cement Co., slip op. at 8 n.7 No. 93-3544 (3d Cir. June 8, 1994); Geary v. Visitation of the Blessed Virgin Mary Parish Sch., 7 F.3d 324, 329 & n.4 (3d Cir. 1993).

employer's proffered reason [for its actions] is unpersuasive, or even obviously contrived, does not <u>necessarily</u> establish that the plaintiff's proffered reason of race is correct." <u>Id</u>. at 2756 (emphasis added). In our most recent decisions addressing this issue, we have followed this teaching that a finding of pretext may lead to a reasonable inference of discriminatory motives, but it does not automatically compel a finding of discrimination. <u>See</u> <u>Miller v. CIGNA Corp.</u>, slip op. at 19-20, No. 93-1773 (3d Cir. June 28, 1994); <u>Seman v. Coplay Cement Co.</u>, slip op. at 9, No. 93-3544 (3d Cir. June 8, 1994); <u>Geary v. Visitation of the Blessed Virgin Mary Parish Sch.</u>, 7 F.3d 324, 329 n.4 (3d Cir. 1993).

B.

In this LAD case, the district court instructed the jury several times that the plaintiffs bore the burden of proving that they were not hired because of their age. <u>See</u> App. at 91-93. The court also instructed the jury that in evaluating Pacific Rail's asserted legitimate business reasons for its actions, they were to decide whether those reasons were its true reasons or whether they "ha[d] been presented to hide or avoid disclosure of the true reason, namely:  age discrimination." App. at 94. In summarizing the charge, the court said:

If I may recap for you, if you find that plaintiff has established . . . <u>either</u>, one, that his/her age was a determining factor "but for" which he/she would have been hired; <u>or</u> two, that the reasons advanced by the defendant for not hiring plaintiff were a pretext, a reason or reasons unworthy of credence, then <u>plaintiff will have established his/her claim of intentional age discrimination and you must return a verdict in his/her favor.</u>  If, however, he/she has failed to establish

either of those two propositions, then your verdict
must be in favor of the defendant.

App. at 94-95 (emphasis added).  Clearly, these instructions
would be an incorrect statement of federal law after <u>Hicks</u>.[4]

C.

The question, however, is whether the New Jersey courts would
apply <u>Hicks</u> in an LAD case.[5]  <u>Hicks</u>, of course, involved the
United States Supreme Court's interpretation of federal anti-
discrimination statutes and case law.  Whether the New Jersey
Supreme Court will decide that the same principles apply in cases
brought under the LAD is another question.

---

[4].  Pacific Rail requested a jury instruction explaining that
even if the jury rejected Pacific Rail's rationale as
unsupported by the evidence or false, the jury would
nevertheless still need to find that the plaintiffs met
their burden of proving wrongful discrimination.  Suppl.
App. at 2799.  The district court did not give this
instruction.

[5].  Pacific Rail contends that plaintiffs are estopped from
arguing that <u>Hicks</u> does not apply because the plaintiffs
contended throughout this litigation that New Jersey courts
generally follow federal law in this area.  Plaintiffs
certainly have consistently taken the position that the
standards and allocations of proof applicable to federal
Title VII cases apply in cases involving the LAD.  But on
these facts we cannot say plaintiffs are estopped from
arguing that <u>Hicks</u> does not apply.  Trial took place in
September, 1992, and post-trial motions were decided in
March and April, 1993.  <u>Hicks</u> was not decided until June,
1993.  Until then, our position on this issue, which the
district court was bound to follow, was one the plaintiffs
believed the New Jersey Supreme Court would also follow.
The fact that the United States Supreme Court has since
disavowed our position should not foreclose the plaintiffs
from arguing that the New Jersey Supreme Court might
nonetheless decide to adopt the approach taken in Title VII
cases in this circuit before <u>Hicks</u>.

The LAD provides:

> It shall be an unlawful employment practice, or, as the case may be, an unlawful discrimination:
>
> a.  For an employer, because of the race, creed, color, national origin, ancestry, age, marital status, affectional or sexual orientation, sex or atypical hereditary cellular or blood trait of any individual, or because of the liability for service in the Armed Forces of the United States or the nationality of any individual, to refuse to hire or employ or to bar or to discharge or require to retire, unless justified by lawful considerations other than age, from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment . . . .

N.J. Stat. Ann. 10:5-12(a).  First enacted in 1945, well before federal legislative attempts to eliminate discrimination in the workplace, the LAD was intended by the New Jersey legislature to eradicate "the cancer of discrimination."  Jackson v. Concord Co., 54 N.J. 113, 124, 253 A.2d 793, 799 (1969); see Lehmann v. Toys `R' Us, Inc., 132 N.J. 587, 600, 626 A.2d 445, 451 (1993).[6]

---

[6].  The New Jersey legislature has provided:

> All persons shall have the opportunity to obtain employment . . . without discrimination because of race, creed, color, national origin, ancestry, age, marital status, affectional or sexual orientation, familial status, or sex, subject only to conditions and limitations applicable alike to all persons.  This opportunity is recognized and declared to be a civil right.

N.J. Stat. Ann. 10:5-4.  It has clearly stated the intent behind the LAD within the statute itself:

> The Legislature finds and declares that practices of discrimination against any of its inhabitants, because of race, creed, color, national origin, ancestry, age, sex, affectional or sexual orientation, marital status, familial status, liability for service in the Armed Forces

The New Jersey Supreme Court has generally looked to standards developed under federal anti-discrimination law for guidance in construing the LAD.  Lehmann, 132 N.J. at 600, 626 A.2d at 452.

The New Jersey Court has adopted the McDonnell Douglas framework,
(..continued)

> of the United States, or nationality, are matters of concern to the government of the State, and that such discrimination threatens not only the rights and proper privileges of the inhabitants of the State but menaces the institutions and foundation of a free democratic State; provided, however, that nothing in this expression of policy prevents the making of legitimate distinctions between citizens and aliens when required by federal law or otherwise necessary to promote the national interest.
>
> The Legislature further declares its opposition to such practices of discrimination . . . in order that the economic prosperity and general welfare of the inhabitants of the State may be protected and ensured.
>
> The Legislature further finds that because of discrimination, people suffer personal hardships, and the State suffers a grievous harm.  The personal hardships include:  economic loss; time loss; physical and emotional stress; and in some cases severe emotional trauma, illness, homelessness or other irreparable harm resulting from the strain of employment controversies; relocation, search and moving difficulties; anxiety caused by lack of information, uncertainty, and resultant planning difficulty; career, education, family and social disruptions; and adjustment problems, which particularly impact on those protected by this act.  Such harms have, under the common law, given rise to legal remedies, including compensatory and punitive damages.  The Legislature intends that such damages be available to all persons protected by this act and that this act shall be liberally construed in combination with other protections available under the laws of this State.

N.J. Stat. Ann. 10:5-3.

although it has noted that it has never "embraced the McDonnell Douglas test literally, invariably, or inflexibly." Grigoletti v. Ortho Pharm. Corp., 118 N.J. 89, 97-98, 570 A.2d 903, 907 (1990). Instead, the New Jersey Supreme Court has demonstrated a marked willingness, and has instructed New Jersey courts in general, to treat the McDonnell Douglas test as "only a general framework for analyzing unlawful discrimination claims" which "must be modified where appropriate." Erickson v. Marsh & McLennan Co., Inc., 117 N.J. 539, 550, 569 A.2d 793, 799 (1990); see generally Carrington v. RCA Global Commun., Inc., 762 F. Supp. 632, 644-45 (D. N.J. 1991) (noting that "[t]here is little reason to believe that New Jersey courts will exhibit slavish devotion to federal law in interpreting the NJLAD").

Thus, the New Jersey Supreme Court has refused to apply the McDonnell Douglas framework in LAD cases alleging gender discrimination in the form of unequal pay, Grigoletti, supra; modified the elements of the McDonnell Douglas prima facie case in the context of reverse discrimination failure-to-hire cases, Erickson, supra; and shifted to employers the burden of proving the validity of their decisions in some handicap discrimination cases. Jansen v. Food Circus Supermarkets, Inc., 110 N.J. 363, 541 A.2d 682 (1988). See also Jamison v. Rockaway Twp. Bd. of Educ., 242 N.J. Super. 436, 445-47, 577 A.2d 177, 183 (1990) (establishing a variation of the McDonnell Douglas framework to apply in cases alleging a retaliatory failure to promote). Plaintiffs point to this willingness to modify the McDonnell Douglas framework as evidence that the New Jersey Supreme Court

would disregard Hicks and instead hold that a plaintiff asserting a claim of employment discrimination pursuant to the LAD is entitled to judgment as a matter of law if he or she has proven a prima facie case and has demonstrated that the reason or reasons the employer gave for the challenged employment action were false.

It is true that the New Jersey Supreme Court has taken to heart the legislature's expressed intention that the LAD is to be construed liberally. See supra note 6. It is also true, however, that the legislature has admonished New Jersey courts to construe the provisions of the LAD "fairly and justly with due regard to the interests of all parties," N.J. Stat. Ann. 10:5-27, as the New Jersey Supreme Court itself recognized in Andersen v. Exxon Co., 89 N.J. 483, 496, 446 A.2d 486, 492 (1982). Read together, these admonitions are not inconsistent with one another and are both significant to and instructive in our search for guidance. As we explain more fully below, because the New Jersey legislature intended to protect and compensate victims of discrimination but not to relieve them of the burden of proving unlawful discrimination, and because the New Jersey rule regarding presumptions parallels the federal rule on presumptions upon which the Hicks Court based its decision, we predict that the New Jersey Supreme Court would endorse Hicks's view that a plaintiff in a discrimination case is not entitled to judgment as a matter of law simply because he or she proves a prima facie case and that the reason or reasons asserted by his or her employer for the challenged action were false.

Our decision is informed by a number of observations concerning New Jersey law.  First, under New Jersey law, as under federal law, plaintiffs have always retained the ultimate burden of demonstrating that the actions they challenged were due to discrimination.  See, e.g., Peper v. Princeton Univ. Bd. of Trustees, 77 N.J. 55, 87, 389 A.2d 465, 478 (1978); Kearny Generating Sys. v. Roper, 184 N.J. Super. 253, 445 A.2d 1159 (1982).[7]  Our understanding of the McDonnell Douglas framework

---

[7].   We acknowledge that the New Jersey Supreme Court has not always been entirely clear on this point.  In Peper, the case in which it decided to adopt the McDonnell Douglas shifting burden scheme, the court stated in dicta that it agreed with the statements of a federal judge who described the McDonnell Douglas scheme as shifting the burden of proof, rather than simply of production, to the defendant once a prima facie case has been made out.  Peper, 77 N.J. at 84, 389 A.2d at 480.  The focus of Peper, however, was on the plaintiff's inability to establish a prima facie case.  That and numerous statements since by the New Jersey Supreme Court and superior courts confirming that the burden of proof does not shift (e.g., Goodman v. London Metals Exch., Inc., 86 N.J. 19, 429 A.2d 341 (1981); Kearny, supra), convince us that this single statement in Peper cannot serve as a basis for concluding that the court would refuse to incorporate the principles of Hicks into the law of the LAD.

Similarly, statements in Jamison v. Rockaway Twp. Bd. of Educ., 242 N.J. Super. 436, 577 A.2d 177 (1990), do not sway our view of the burden placed on a plaintiff asserting a straightforward LAD claim.  In that case, the New Jersey Superior Court referred extensively to a decision of the Court of Appeals for the Ninth Circuit, Wrighten v. Metro. Hosp., Inc., 726 F.2d 1346 (9th Cir. 1984), describing the McDonnell Douglas formulation applicable in retaliatory discharge cases.  The Jamison court cited Wrighten as providing that an employee asserting a retaliatory discharge may "show by preponderating evidence that a discriminatory intent motivated the employer's action" by "proving that the articulated reason is a pretext for the retaliation or that a discriminatory reason more likely motivated the employer."  Jamison, 242 N.J. Super. at 445,

before Hicks similarly required that the plaintiff bear the ultimate burden of proving that the challenged employment action resulted from unlawful discrimination.  See, e.g., Billet v. CIGNA Corp., 940 F.2d 812, 817 (3d Cir. 1991).  Our decisions finding that this burden could be borne merely by demonstrating that the asserted legitimate, non-discriminatory reasons for the employer's actions were incredible were based on the weight given to the McDonnell Douglas prima facie case as a "presumption."  In other words, our (and other courts') reasoning that proving pretext entitled plaintiff to judgment reflected a belief that the presumption of discrimination raised by the plaintiff's ability to make out a prima facie case had not been rebutted and was only strengthened by the proven falsity of the reasons the employer gave for its actions, thus mandating a decision that the employer's actions had been motivated by unlawful discrimination.  See Hicks, 113 S. Ct. at 2762-63 (Souter, J., dissenting).  Hicks clarified that under federal law the presumption raised by establishment of the prima facie case no longer exists once an employer has articulated a legitimate, nondiscriminatory reason for its actions.  It does not hold that proving that reason false

(..continued)
577 A.2d at 182 (emphasis added).  Doing so, the court added, creates "a presumption . . . that the adverse employment action was the product of improper retaliatory intent.  . . .  Then, the employer must prove by the preponderance of the evidence that the adverse action would have been taken regardless of retaliatory intent."  Id. at 445-46, 577 A.2d at 182.  The shifting of the ultimate burden in a retaliatory discrimination case does not necessarily imply that the New Jersey Supreme Court would advocate any shift or lessening of the burden in a straightforward failure-to-hire case.

will never suffice to support a decision for a plaintiff; it merely establishes that the plaintiff does not merit judgment as a matter of law once falsity is proven.

In thus clarifying the law, the Court in Hicks referred to and relied upon Federal Rule of Evidence 301, concerning presumptions.[8] Hicks, 113 S. Ct. at 2747; see also id. at 2749 ("[T]he Court of Appeals' holding that rejection of the defendant's proffered reasons compels judgment for the plaintiff disregards the fundamental principle of Rule 301 that a presumption does not shift the burden of proof, and ignores our repeated admonition that the Title VII plaintiff at all times bears the `ultimate burden of persuasion.'"). The New Jersey Supreme Court has similarly interpreted the LAD, describing the prima facie stage of the McDonnell Douglas test as establishing a "rebuttable presumption" of discrimination. Erickson, 117 N.J. at 551, 569 A.2d at 799. It has also stated that when a defendant rebuts the presumption by articulating a legitimate nondiscriminatory reason for its actions, the inference of discrimination which literally arose from the plaintiff's evidence is destroyed. Goodman v. London Metals Exch., Inc., 86

_____

[8]. Rule 301 provides:

> In all civil actions and proceedings not otherwise provided for by Act of Congress or by these rules, a presumption imposes on the party against whom it is directed the burden of going forward with evidence to rebut or meet the presumption, but does not shift to such party the burden of proof in the sense of the risk of nonpersuasion, which remains throughout the trial upon the party on whom it was originally cast.

N.J. 19, 33, 429 A.2d at 341, 348 (1981).  Therefore,

corresponding reference to the New Jersey Rule of Evidence

regarding presumptions seems appropriate, and our reference

thereto provides further support for the conclusion that New

Jersey would clarify the law of the LAD as the Court in Hicks

clarified Title VII jurisprudence.

Like Federal Rule of Evidence 301, New Jersey Rule of Evidence

301[9] provides that the introduction of evidence to rebut a

presumption destroys that presumption, leaving only that evidence

and its inferences to be judged against the competing evidence

and its inferences to determine the ultimate question at issue

(in an LAD case, the question of whether the defendant illegally

---

[9].    The rule provides:

> Except as otherwise provided in Rule 303 or
> by other law, a presumption discharges the
> burden of producing evidence as to a fact
> (the presumed fact) when another fact (the
> basic fact) has been established.
>
> If evidence is introduced tending to disprove
> the presumed fact, the issue shall be
> submitted to the trier of fact for
> determination unless the evidence is such
> that reasonable persons would not differ as
> to the existence or nonexistence of the
> presumed fact.  If no evidence tending to
> disprove the presumed fact is presented, the
> presumed fact shall be deemed established if
> the basic fact is found or otherwise
> established.  The burden of persuasion as to
> the proof or disproof of the presumed fact
> does not shift to the party against whom the
> presumption is directed unless otherwise
> required by law.  Nothing in this rule shall
> preclude the judge from commenting on
> inferences that may be drawn from the
> evidence.

discriminated against the plaintiff).  Specifically, it states that "[i]f evidence is introduced tending to disprove the presumed fact, the issue shall be submitted to the trier of fact for determination unless the evidence is such that reasonable persons would not differ as to the existence or nonexistence of the presumed fact."  The commentary to the rule provides that "a valid presumption can be used to establish a prima facie case, but the presumption normally disappears in the face of conflicting evidence.  Nevertheless, any logical inference which can be drawn from the basic fact remains."  N.J. R. Evid. 301, 1994 supplemental comment.[10]  Therefore, the rule states with regard to state law exactly what Hicks has explained to be the operation of federal anti-discrimination law under the McDonnell Douglas shifting burden analysis.  The New Jersey Supreme Court may choose, as a policy matter, to interpret the LAD even more broadly, so that the usual rules governing presumptions do not apply in LAD cases, cf. N.J. R. Evid. 301 (rule governs "[e]xcept as otherwise provided . . . by other law"), but in the face of this explicit explanation of the operation of presumptions under New Jersey law, we cannot make that state law policy decision for it.  Compare Schweigert v. Provident Life Ins. Co., 503 N.W.2d 225, 288-29 (N.D. 1993) (refusing to adopt Hicks formulation because of different state rule on presumptions).

---

[10].  Rule 301 replaced N.J. R. Evid. 14, cited by the PTL employees, effective July 1, 1993.  Commentary to it indicates that Rule 301 reflects established New Jersey law.

This is particularly true in light of the New Jersey courts' general adoption of federal anti-discrimination law as their guidepost. Indeed, the courts' willingness to depart from federal precedent in the anti-discrimination area has occurred in only three contexts, involving either modification of the McDonnell Douglas framework to fit specific factual situations (e.g., Erickson and Jansen), departure from that framework in accordance with cases decided by various federal courts of appeals (Grigoletti), or departure from the standards we apply in favor of what it believes to be a more sensible interpretation of United States Supreme Court precedent (Lehmann). It has never rejected outright the United States Supreme Court's approach to federal anti-discrimination law; to the contrary, it has noted that there exists "an imputed but strong legislative intent to harmonize the State's anti-discrimination statutes with the dominant federal view to maximize the protections for the victims of discrimination and . . . to benefit all of society by these efforts." Grigoletti, 118 N.J. at 108, 570 A.2d at 913. Finally, the New Jersey Supreme Court's decision in Goodman provides further support for our decision, if only by implication. In Goodman, the court considered a case in which a company and its principals argued that a hearing examiner in the New Jersey Division on Civil Rights had misapplied the burden of proof. The complainant, a female job applicant, established a prima facie case that she had not been hired because of her gender. The respondents contended that she was not granted an interview because her attitude had been unpleasant. The hearing

examiner nevertheless ruled for the complainant, stating that the "`case ultimately turns on credibility'" and that he believed the complainant.  Goodman, 86 N.J. at 33, 429 A.2d at 348.  The New Jersey Supreme Court ruled that the hearing examiner had properly applied the McDonnell Douglas shifting burden scheme:

> The explanation given by respondents for complainant's rejection was sufficient for the employer to meet its burden of articulating a legitimate nondiscriminatory reason for the rejection and thus destroy `the legally mandatory inference of discrimination arising from the plaintiff's initial evidence.'  . . .  However, the trier of fact may nevertheless be persuaded by that evidence and its inferences combined with that adduced from the respondents that the employer's proposed explanation is unworthy of belief and is nothing more than a mere pretext for unlawful discrimination.

Goodman, 86 N.J. at 33, 429 A.2d at 348 (emphasis added).  In explaining why it believed the hearing examiner had correctly applied McDonnell Douglas, the court stated not only that the hearing examiner had said he found the plaintiff and her witness to be truthful, but also that he had "concluded that the reason given by the employer for [the plaintiff's] rejection was pretextual and that the true reason for her rejection was `because she was a woman.'"  Id. at 33-34, 429 A.2d at 349 (emphasis added).  Thus, the New Jersey Supreme Court did not find that mere disbelief of the employer would support a decision for the complainant; it affirmed the hearing examiner's decision because he had disbelieved the employer and had decided that the true reason for the employer's failure to hire the plaintiff was unlawful discrimination.  This is consistent with Hicks and

supports our belief that the New Jersey Supreme Court would follow Hicks in interpreting the LAD.

In conclusion, we are persuaded that the New Jersey Supreme Court would ultimately determine that plaintiffs in employment discrimination cases under the LAD may not necessarily prevail merely by proving a prima facie case and rebutting an employer's asserted legitimate non-discriminatory reasons for its actions. That level of proof may suffice if the factfinder believes that the employer offered false reasons to conceal unlawful discrimination, but it does not mandate entry of judgment for the plaintiff.  Instead, as provided in the New Jersey Rule of Evidence governing presumptions and their operation, the case must go to the factfinder for decision of the ultimate issue -- whether the employer had engaged in unlawful discrimination. Thus, the trial court erred in propounding jury instructions that would entitle the plaintiffs to judgment if they merely presented a prima facie case and demonstrated that the defendant's asserted grounds for decision were pretextual.

III.

Our conclusion that the New Jersey Supreme Court would incorporate the Hicks principles into its LAD jurisprudence requires that this case be retried.  We do not believe that the New Jersey Supreme Court would choose to apply this clarification of New Jersey law only prospectively, as the PTL employees

argue.[11]  Nor do we accept either side's contention that this case can be decided at the appellate level, without a remand. Plaintiffs argue that the trial court's charge to the jury, instructing that they at all times bore the burden of proving that they were not hired because of their age, cured any error that may have occurred when the court instructed that they would win if they had proven that the reasons Pacific Rail advanced for failing to hire them were false.  We cannot agree, for while the trial court correctly placed the burden of proving illegal discrimination on the plaintiffs at all times, the statement rendered incorrect in light of <u>Hicks</u> was direct and explicit and served to summarize the charge for the jury.  If there was any portion of the charge that guided the jury's deliberations, it was more than likely the portion we have held to be erroneous. On the other hand, Pacific Rail contends that we need not remand this case but instead may enter judgment for it because the evidence was insufficient to support a verdict in the plaintiffs' favor even under an appropriate charge.  We cannot   agree with

---

[11].    The employees argue that, "[a]t a minimum, if the New Jersey Supreme Court were to follow <u>Hicks</u> it would only apply its holding prospectively."  Appellees/Cross-Appellants' Brief at 16.  Unlike New Jersey law, "Prospective application is appropriate when a decision establishes a new principle of law by overruling past precedent or by deciding an issue of first impression." <u>Montells v. Haynes</u>, 133 N.J. 282, 295, 627 A.2d 654 (1993). As explained above, the New Jersey Supreme Court would not be overturning past precedent or deciding a new issue by following the <u>Hicks</u> approach; it would merely be clarifying prior decisions.  There is no reason to believe that the New Jersey Supreme Court would choose to apply such a decision only prospectively.

this contention, either.  Undeniably, plaintiffs' evidence was aimed mainly at proving pretext, but that evidence, viewed in the light most favorable to the verdict winner (Billet, 940 F.2d at 817), could conceivably have supported a decision for the plaintiffs under the correct charge.

In light of our inability to divine whether the jury's verdict was premised on correct or erroneous portions of the charge, we will remand the case for retrial under the principles we have set forth above.

## IV.

Some of the issues the parties have raised have been rendered moot by our decision thus far.[12]  Others, however, remain, for they determine whether certain claims are still properly at issue in this case and thus whether they should be addressed on remand.

---

[12]. Specifically, given that the judgment will be vacated and the case retried, we see no reason to decide whether the trial court erred in (1) refusing to order remittitur of some plaintiffs' backpay awards, (2) awarding plaintiffs prejudgment interest, or (3) refusing to order reinstatement.

We may quickly dispose of one issue raised by Pacific Rail which still must be resolved.  Pacific Rail argues that the district court erred in refusing to dismiss the cases of plaintiffs Phyllis Lindh, Sal Petruzzelli and Ed Dechert for failure to establish a prima facie case.  After reviewing the record, we do not agree that the district court erred.  Depending upon credibility judgments, which we are in no position to make, the evidence may be sufficient to support a verdict for each of these plaintiffs.

A.

Among these is a question which arose after trial as to whether the plaintiffs were entitled to front pay awards. Plaintiffs stated in their complaint that they sought "a judgment ordering defendant to offer them employment and to pay back wages, compensatory damages, punitive damages and attorneys' fees." App. at 14. They alleged that as a result of Pacific Rail's actions they had "lost income and otherwise suffered the effects of discrimination on account of their age," App. at 20, and sought judgment "[o]rdering defendant to offer employment to plaintiffs and make them whole for all wages and benefits lost by reason of defendant's unlawful discrimination; granting compensatory damages to plaintiffs; . . . and [g]ranting any further relief the Court deems just and proper." Id. at 21. The final pretrial order, upon which the parties collaborated and which the magistrate judge handling pretrial matters reviewed and entered, said only that "[a]s a result of defendant's actions, plaintiffs have lost income and otherwise suffered the effects of discrimination on account of their age." Id. at 42. They were ordered to quantify their damages by March 16, 1992 (id.), but they did not do so. The first mention of "front pay," or compensation for future lost earnings, surfaced two weeks prior to trial, when plaintiffs submitted proposed jury instructions requesting an instruction on front pay. Id. at 2689, 2702. Over an objection from Pacific Rail, the district court decided to charge on front pay, but after the jury returned a verdict of

more than $5 million in front pay, the court granted a post-trial motion to strike the front pay award.

 In light of the way this case developed, the district court did not abuse its discretion in striking the plaintiffs' front pay award as a sanction for having failed to claim front pay prior to two weeks before trial (and even then only to mention it in proposed jury instructions, which included many items not at issue).  Plaintiffs argue that their request for "compensatory damages" encompasses an award of future lost earnings, but in the context of the pleadings filed in this case, we cannot say that their vague pleading style -- even under the lenient rules of notice pleading -- sufficed to put Pacific Rail on notice of a claim for front pay.  Moreover, had there been any question, the plaintiffs had every opportunity to clarify the damages they sought in the pretrial order.  When they failed to do so, the magistrate judge ordered quantification of their damages by a date certain -- an opportunity to put Pacific Rail on notice of their claims which the plaintiffs simply did not seize. In these circumstances, then, the district court did not abuse its discretion in striking the plaintiffs' front pay awards at the conclusion of the first trial.  Rather than usurp the district court's role as presider over the second trial, we hold only that on remand it will be left to the sound discretion of the district court to determine in the interests of fairness and justice whether to allow any new claims.

B.

Although the plaintiffs cannot claim front pay on remand, they will be permitted to seek emotional distress damages, contrary to the rulings of the magistrate judge and district court. This case was originally bifurcated so that liability would be tried separately from damages. The parties initially prepared their pretrial order with that in mind, but for some reason, presumably discussed during a pretrial conference with the magistrate judge, it was decided that the case would not be bifurcated. App. at 64. Because they had apparently only envisioned a trial on liability prior to this, plaintiffs then sought permission to list exhibits regarding damages and to amend the pretrial order to list additional witnesses, who happened to be doctors, to support their claims of emotional distress damages. App. at 2746, 2761. The magistrate judge permitted plaintiffs to include additional exhibits to support their claims for pecuniary damages (to which Pacific Rail did not object), but denied plaintiffs' request to name the doctors as witnesses. In conjunction with that decision, the magistrate judge struck the plaintiffs' claims for emotional distress damages because he believed that "competent medical testimony of an expert nature . . . as to the causation of any emotional distress" was required.[13] App. at

---

[13]. Significantly, the plaintiffs were not offering the doctors as expert witnesses, for they had no expert reports from which the doctors could state expert opinions. App. at 2759. Instead, they intended that the doctors would testify as lay witnesses describing what they had observed. Thus, this is not a case in which a denial of a motion to amend to add the doctors as witnesses resulted in the lack of evidence for which the claims were dismissed. Refusing

2762.  The district court affirmed this ruling when plaintiffs appealed.

Plaintiffs argue that their claims for emotional distress damages should not have been stricken.  In reviewing the magistrate judge's decision to this effect, the district court had to determine whether that decision was "clearly erroneous or contrary to law."  28 U.S.C. § 636(b)(1)(A); Cipollone v. Liggett Group, Inc., 785 F.2d 1108, 1120 (3d Cir. 1986).  The question before the magistrate judge, the district court and us does not, as Pacific Rail argues, arise in the context of Rule 701 of the Federal Rules of Evidence (regarding opinion testimony by lay witnesses) but is instead a matter of New Jersey law concerning whether expert evidence is needed to prove emotional distress damages in this type of case.  We will thus determine whether the magistrate judge's decision to strike plaintiffs' claims for emotional distress damages was contrary to law.  Cf. Bolden v. Southeastern Pennsylvania Transp. Auth., 953 F.2d 807, 829 n.30 (3d Cir. 1991) (whether district court properly dismissed punitive damages request is question of law subject to plenary review).

"Emotional stress" damages may be recovered under the LAD.  N.J. Stat. Ann. 10:5-3; Milazzo v. Exxon Corp., 243 N.J. Super. 573, 580 A.2d 1107 (1990).  New Jersey courts require expert testimony to prove the causal link between a claimed injury and the
(..continued)
        to permit the doctors to testify merely lessened the number
        of lay witnesses who would be testifying for plaintiffs.
        It did not deprive them of expert testimony.

tortious act alleged when the plaintiff is claiming that he or she suffered subjective injury (such as pain, humiliation, emotional distress) that is not obviously related to an identifiable injury. Kelly v. Borwegen, 95 N.J. Super. 240, 243-44, 230 A.2d 532, 534 (1967). This requirement is based on a concern that "a jury should not be allowed to speculate on the issue of causation. If the question of causal relation is so esoteric that lay minds cannot form any intelligent judgment about it without expert aid an opinion from an expert may be required." Bushman v. Halm, 798 F.2d 651, 659 (3d Cir. 1986) (applying New Jersey law and citing 2 F. Harper & F. James, Jr. The Law of Torts § 20 at 15-16, § 21 at 1116-17 (1956)). The requirement is not without boundaries, however. In Bushman, for example, we held that a "plaintiff is not required under New Jersey law to submit expert medical opinion on the element of legal causation to establish a prima facie case of negligence." Bushman, 798 F.2d at 653. In that case, a plaintiff whose truck had collided with a United States Postal Service jeep sued the government under the Federal Tort Claims Act alleging negligence. The trial court granted summary judgment to the government because the plaintiff had alleged only "soft tissue injuries" (i.e., he was seeking recovery only for pain and suffering related to an injury to his knees, which had struck the dashboard in the accident), and his expert witness had not opined that his pain was caused by the accident. We reviewed Kelly and Menza and determined that New Jersey law requires a case-by-case analysis to determine when expert testimony is required to buttress

subjective complaints of pain and suffering.  The key question is whether there is evidence tending to show some objective basis for the pain.  If there is, no expert testimony is needed because a jury is competent to decide whether there exists a causal connection.

In Bushman,
plaintiff testified that his legs were pain-free prior to the accident.  However, he stated that he experienced recurrent pain in his knees and surrounding soft tissues after they contacted his truck's dashboard during the accident. . . .  Plaintiff has adequately drawn into question the objective nature of his pain and suffering through his own sworn statements.  The pain and suffering plaintiff experienced immediately after the accident is directly linked to objectively identifiable symptoms of soft tissue injury verified in the medical evidence.  Thus, the lower court erred when it concluded that plaintiff's injuries were "not obviously related to an identifiable injury."

Bushman, 798 F.2d at 660.

Here, we are not apprised of any objective evidence supporting the plaintiffs' claims of emotional distress.  Neither the magistrate judge, nor the district court, nor this court has been presented any evidence of "objectively identifiable symptoms" upon which the plaintiffs rely to support their claims.  Absent such evidence, the alleged emotional distress in this case seems to resemble Menza and Kelly.  (In Menza, the plaintiff claimed chest pain 21 months after a fall, and in Kelly, the plaintiff alleged permanent difficulty in sleeping, walking, climbing steps and breathing after a car accident.)  Plaintiffs allege subjective claims of emotional distress, but we have no

objectively identifiable, medically verified symptoms as the plaintiff had in <u>Bushman</u>.

On the other hand, the magistrate judge's decision was made well before trial, when no evidence had yet been presented. Some of the plaintiffs may be able to establish objectively identifiable symptoms from which a jury could infer causation even in the absence of an expert witness. If, as to some or all plaintiffs, there exists other evidence tending to establish causation, such as objectively identifiable symptoms appearing close in time to Pacific Rail's takeover at North Bergen, then the plaintiffs who presented such evidence might not need to present expert evidence to reach the jury. Thus, the magistrate judge's wholesale dismissal of all the plaintiffs' claims for emotional distress damages without knowing anything more about each plaintiff's case was "contrary to law." 28 U.S.C. § 636(b)(1)(A). Plaintiffs' claims for emotional distress damages are to be reinstated on remand.

C.

To further assist the district court on remand, we will also review plaintiffs' allegations that the court erred in dismissing the cases of five former PTL workers. We will affirm its dismissal of all but one of those plaintiffs. On remand, that one plaintiff's claims are to be reinstated for consideration of whether his cause of action survived his death.

1.

Four of these plaintiffs' cases are easily addressed. The district court properly dismissed the cases of David Quaid, John

Gugliotta, Andrew Hennessey and Adam Lukasweski because the evidence was insufficient to support judgment for them as a matter of law.

Quaid's case falters because of insufficient evidence from which a jury could conclude that he was injured. Evidence at trial revealed that a Pacific Rail representative called Quaid three times to offer him a job, but Quaid did not accept. The first time, September 1, Quaid told the representative that he was "number ten" on the list (presumably the union's seniority list) and that Pacific Rail would have to ask the nine men or women above him on the list before he would accept a job. App. at 729-30. The second time, September 3, Quaid reiterated this and told the Pacific Rail representative he would get back to him. App. at 730-31. The third time, in the third week in September, the representative again told Quaid that Pacific Rail would like Quaid to work for the company. Quaid said that he would work for Pacific Rail but did not accept the job because of ongoing union proceedings. Specifically, he stated that he did not want to "jump[] before [he] knew where [he] was going to land and then wind[] up in limbo." App. at 737. Quaid stated at trial that he "never, never refused employment," "[n]ever turned [Pacific Rail] down," that "[Pacific Rail understood] that I wanted the job," and that "[a]ll I did was to ask [Pacific Rail] for time. But there was [sic] never any refusals." App. at 728. Quaid's explanations, however, fail to negate the fact that he did not accept employment that was offered to him and cannot be

considered to have been injured by Pacific Rail's actions when Pacific Rail actually offered him employment.

Gugliotta, Hennessey and Lukasweski present similar situations. These three plaintiffs were receiving workers' compensation payments for medical conditions at the time Pacific Rail took over at North Bergen. They could not have been denied jobs because of their age; they were not available to occupy positions when Pacific Rail needed them. The only argument the plaintiffs advance in opposition to this reasoning is a contention that Pacific Rail would have offered them jobs even if they were injured but for age discrimination. As evidence for this proposition, they note that a Pacific Rail representative, upon seeing Gugliotta in early September, asked Gugliotta if he was ready to work, thus impliedly offering him a job. The representative's statement, however, was not exactly a job offer but was more in the nature of an inquiry about when Gugliotta might be ready to work. App. at 1356. Moreover, Gugliotta refused (id.), so even if it was a job offer, that merely transforms his particular case into one which resembles Quaid's more than Hennessey's and Lukasweski's. Dismissal of their cases was not error.

2.

Finally, we address the case of the estate of plaintiff Al
Armetta, who passed away in December, 1991, after commencement of
this lawsuit.  Plaintiffs' attorneys apparently learned of
Armetta's death in August, 1992, and defense counsel was notified
either then or on the first day of trial in mid-September, 1992.
Plaintiffs' counsel never filed a "suggestion of death" or served
formal written notice of the death on defense counsel or the
court.

At trial, upon learning of Armetta's death, the district court
ruled that Armetta should be stricken from the case.  At the
close of plaintiffs' case, in discussing directed verdict
matters, plaintiffs' counsel argued that Armetta's estate should
be considered a plaintiff for purposes of claiming damages until
the time of his death.  The court refused because "there ha[d]
been no substitution of Mr. Armetta's estate in this matter."
App. at 964.  The district court judge stated that he did not
"know that [Armetta's] estate has an interest in this matter,"
and pointed out that there was no "motion nunc pro tunc or . . .
to relax the rules" about Armetta.  App. at 1018.  Plaintiffs'
counsel stated that he had spoken with Armetta's widow, who had
said she wanted to continue the lawsuit.  Id.  The court refused
to accept this representation and, the next day, denied counsel's
oral motion to substitute Mrs. Armetta for her husband, saying
that plaintiffs had produced no proof that Mrs. Armetta was the
executrix of Armetta's estate.  It rejected plaintiffs' counsel's
offer to supply such proof.  Id. at 1023-26.  Specifically, the

district court denied the motion because (1) it questioned whether this cause of action survived Armetta's death, (2) "[t]here has been no showing of excusable neglect . . . [or] actions on the part of the defendant which would put the plaintiff in a prejudicial position," (3) there was no proof that Mrs. Armetta was the executrix of Armetta's estate, and (4) it was too late to move to substitute Armetta's estate as a plaintiff because the defendant had had no chance to conduct discovery concerning "whoever the estate is" or "to do anything that is necessary to prepare for trial."  Id. at 1029-30.

Rule 25(a)(1) provides:
> If a party dies and the claim is not thereby extinguished, the court may order substitution of the proper parties. The motion for substitution may be made by any party or by the successors or representatives of the deceased party and, together with the notice of hearing, shall be served on the parties as provided in Rule 5 and upon persons not parties in the manner provided in Rule 4 for the service of a summons, and may be served in any judicial district.  Unless the motion for substitution is made not later than 90 days after the death is suggested upon the record by service of a statement of the fact of the death as provided here for the service of the motion, the action shall be dismissed as to the deceased party.

Fed. R. Civ. P. 25(a)(1).  Thus, if a party dies, ideally his or her attorney will file a "suggestion of death" with the court and serve it upon all parties.  After the suggestion of death is filed, a 90-day countdown begins.  Within 90 days, some other party or the executor or administrator of the deceased must move for substitution of the estate for the deceased, or the deceased's case will be dismissed.  Decisions on the motion for substitution are within the trial court's discretion.  Fed. R.

Civ. P. 25(a) ("the court may order substitution"); Advisory Committee Note to 1963 Amendments.

Nothing was ideal here. Plaintiffs' counsel served neither a formal suggestion of death nor a formal motion for substitution. That does not mean, however, that the district court properly denied the motion made at trial to substitute Armetta's estate as the plaintiff claiming damages on his behalf. Nothing in Rule 25 says that a suggestion of death must be made or sets forth a time frame for doing it. In circumstances in which the deceased's counsel only recently learned of the death, failure to file a suggestion of death within a particular period of time does not constitute sufficient grounds for refusing such a motion. Moreover, the district court's denial on the basis that the plaintiff did not make a formal motion, filed and served in accordance with Rule 25, also was, in our view, an overly strict interpretation of the rule. We have indicated a willingness to permit lesser attempts to suffice. See Anderson v. Republic Motor Inns, Inc., 444 F.2d 87 (3d Cir. 1971) (reversing a district court's dismissal of a case for failure to comply with Rule 25(a) because the plaintiff's attorney had noted in his pretrial memorandum that the wife, as executrix of the estate, intended to continue as substitute plaintiff). In doing so, we have emphasized that our lenient view would apply only in "an extraordinary case, and that departure from the requirements of the Federal Rules is not to be permitted routinely," Anderson, 444 F.2d at 89, but this case strikes us as extraordinary. Here, the district court ruled that plaintiffs' counsel had failed to

move for substitution within an appropriate time, yet the time period for so moving had not yet begun to run because death had not yet been suggested on the record. Cf. 7C C. Wright, A. Miller & M. Kane, Federal Practice and Procedure § 1955 at 544 (2d ed. 1986) ("the time does not run until the death is suggested on the record"). Concerns about prejudice to the defendant are not well-placed in this instance, for the record reveals that defense counsel was notified of Armetta's death very shortly after plaintiffs' counsel became aware of it. And, contrary to the district court's view, Rule 25 contains no "excusable neglect" standard by which the district court is to gauge its exercise of discretion. We fully understand why the court might desire some written proof of Armetta's death and of the estate's desire to proceed with his case, but we see no reason not to permit plaintiff's counsel an opportunity to produce such proof before deciding the motion.

Thus, we cannot find that the district court exercised sound discretion on this issue. Armetta's claims should be re-examined on remand, and plaintiffs' counsel is to be given an opportunity to provide written proof of Armetta's death, his widow's relationship to his estate and the estate's wishes with regard to proceeding in this lawsuit. Also on remand, however, the parties are to address the district court's first concern, namely whether Armetta's LAD claim survived his death. See Fed. R. Civ. P. 25(a)(1) (substitution permitted "[i]f a party dies and the claim is not thereby extinguished"). This issue is a matter of state law, cf. Ransom v. Brennan, 437 F.2d 513, 520 (5th Cir. 1971);

see N.J. Stat. Ann. 2A:15-3, which we decline to resolve at this stage because the parties have neither briefed nor argued it either here or before the district court.

## V.

In conclusion, we predict that the New Jersey Supreme Court would accept the Supreme Court's decision in Hicks as clarifying LAD law, just as Hicks did federal anti-discrimination law.  Our conclusion to that effect necessitates a remand of this case for retrial in accordance with this opinion.  On remand, although plaintiffs may not seek front pay, they may assert claims for emotional distress damages.  In addition, the claims of deceased plaintiff Al Armetta are to be reinstated so that the district court may consider whether Armetta's claims survived his death and, if so, so that his claims may be tried along with those of the other plaintiffs.

<u>Peter McKenna, et al. v. Pacific Rail Services</u>, Nos. 93-5253,
93-5277, 93-5375 and 93-5386


<u>MANSMANN, J.</u>, dissenting.


I.

I agree with the majority that our role is to determine
whether the New Jersey Supreme Court would adopt for the LAD the
Supreme Court's analysis in <u>Hicks</u>. <u>Commissioner v. Estate of</u>
<u>Bosch</u>, 387 U.S. 456, 465 (1966); <u>McKenna v. Ortho Pharmaceutical</u>
<u>Corp.</u>, 622 F.2d 657, 661-62 (3d Cir. 1980), <u>cert. denied</u>, 449
U.S. 976 (1980). It is without doubt, as the majority holds,
that were the New Jersey Supreme Court to apply the <u>Hicks</u> rule of
law to the LAD, this case would require a new trial because the
jury instructions did not provide the <u>Hicks</u> framework.[14] See

[14]. <u>Hicks</u> settled conflicting decisions found among the
courts of appeals regarding whether the jury's finding of
employer pretext mandates the finding of illegal discrimination
in Title VII cases. <u>Hicks</u>, 113 S. Ct. at 2750. The burdens of
production and the order for the presentation of proof were set
forth mainly in <u>McDonald-Douglas Corp. v. Green</u>, 411 U.S. 792
(1973), and then revisited in <u>Texas Dept. of Community Affairs v.</u>
<u>Burdine</u>, 450 U.S. 248 (1981). Contrary to what we stated in
<u>Duffy v. Wheeling Pittsburgh Steel Corp.</u>, 738 F.2d 1393, 1395-96
(3d Cir. 1984), <u>Hicks</u> states that after a plaintiff makes a prima
facie case of discrimination and the defendant rebuts that with
legitimate non-discriminatory reasons, the presumption raised by
the prima facie case drops from the case, and the plaintiff now
must show that the defendant's proffered reasons were not the
true reasons for the employment decision <u>and that the</u>
<u>discriminating characteristic was</u>. <u>Hicks</u>, 113 S. Ct. at 2747.
No longer is it sufficient for the plaintiff to show that the
defendant's proffered reasons were pretextual.

Pacific Rail argues, first, that because the New Jersey
courts have consistently applied the principles and analysis
developed by the federal courts in Title VII age and sex
discrimination claims, they would continue to do so in this

Majority slip op. at 13.  It is in the majority's prediction of what the New Jersey Supreme Court would hold that we part ways, and because I believe it will not adopt the Hicks analysis for the LAD, I respectfully dissent.[15]

We have, of course, previously articulated the proper standard to be used in predicting state law:

> In attempting to forecast state law we "must consider relevant state precedents, analogous decisions, considered dicta, scholarly works, and any other reliable data tending convincingly to show how the highest court in the state would decide the issue at hand."

McGowan v. University of Scranton, 759 F.2d 287, 291 (3d Cir. 1985) (quoting McKenna, 622 F.2d at 663).  See also Blum v. Witco Chemical Corp., 829 F.2d 367, 376 (3d Cir. 1987).

## II.

Historically, as the majority correctly points out, Majority slip op. at 15-16, New Jersey has generally followed Title VII federal precedent in interpreting the LAD.  For a list of such cases, see Grigoletti v. Ortho Pharmaceutical Corp., 570

(..continued)
context.  The error in this reasoning is simply that it fails to consider that a new interpretation of the burden of proof has been established.  Second, Pacific Rail suggests that, because the plaintiffs originally argued that federal precedent should apply to this case, they are estopped now from changing their position before this court.  Such a contention is meritless, for again it fails to consider that a new rule regarding the various burdens has been established in the interim.  See Majority slip op. at 13 n.5.

[15].     I join the court's analysis in Part IV.

A.2d 903, 907 (N.J. 1990). Nonetheless, as the majority also agrees, Majority slip op. at 16-17, New Jersey is not wedded to federal precedent and applies it selectively. The New Jersey Supreme Court has stated:

> In construing the terms of the LAD, the court has frequently looked to federal precedent governing Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e-2000e-17 ("Title VII"), as "a key source of interpretative authority." Although the "substantive and procedural standards that we have developed under the State's LAD have been markedly influenced by the federal experience," we have "applied the Title VII standards with flexibility" and "have not hesitated to depart" from federal precedent "if a rigid application of its standards is inappropriate under the circumstances."

Lehmann v. Toys `R' Us, Inc., 626 A.2d 445, 452 (N.J. 1993) (citations to quotations omitted). Grigoletti, 570 A.2d at 907 ("[T]he court has never embraced the McDonnell Douglas test literally, invariably or inflexibly."); Erickson v. Marsh & Mclennan Co., 569 A.2d 793, 799 (N.J. 1990) ("We have recognized, however, that the criteria announced in Peper, Goodman, and Anderson provide only a general framework for analyzing unlawful discrimination claims and must be modified where appropriate."); Clowes v. Terminix Intern., Inc., 538 A.2d 794, 805 (N.J. 1988) ("Under [certain] circumstances the McDonnell Douglas analysis should be used only to the extent that its application is appropriate."); Peper v. Princeton University Board of Trustees, 389 A.2d 465, 479 (N.J. 1978) ("While we commend the McDonald-

_Douglas_ standards to our trial courts as a starting point in actions brought under the Law Against Discrimination or any other State proscription against discrimination, it must be emphasized that these tests are to be used only where and to the extent that their application is appropriate.").

It is especially relevant that whenever federal precedent establishes a standard that makes it _more_ difficult for the plaintiff to make its case, the New Jersey Supreme Court departs. _Lehmann v. Toys `R' Us, Inc._, 626 A.2d at 453 (denouncing the _Andrews_ test from this circuit and creating a new test for sexual harassment under the LAD); _Montells v. Haynes_, 627 A.2d 654, 661 (N.J. 1993) (disregarding United States Supreme Court caselaw questioning prospective application of a new rule of law in a sexual harassment case under the New Jersey LAD); _Grigoletti_, 570 A.2d at 913 (adopting the EPA standard, which is more burdensome on the defendant, rather than the Title VII standard for gender discrimination claims); _Anderson v. Exxon Co._, 446 A.2d 486, 494 (N.J. 1982) (declining to follow the allocation of the burdens of proof established in _McDonald–Douglas_ to LAD claims for handicap discrimination); _Castellano v. Linden Board of Education_, 386 A.2d 396, 402 (N.J. Super. Ct. App. Div. 1978), _mod. on other grounds_, 400 A.2d 1182 (N.J. 1979)

(holding that pregnancy discrimination violated the LAD contrary to the Supreme Court's decision in <u>Gilbert</u>).[16]

<hr>

[16]. Similarly, the district courts in New Jersey have also recognized the independence of New Jersey courts in interpreting the LAD.

> There is little reason to believe that New Jersey courts will exhibit slavish devotion to federal law in interpreting the NJLAD. Quite the contrary, in construing New Jersey antidiscrimination law, enacted nearly twenty years before the analogous federal statute prohibiting employment discrimination, <u>see</u>, <u>Shaner v. Horizon Bancorp.</u>, 116 N.J. 433, 436, 561 A.2d 1130 (1989); <u>Nolan v. Otis Elevator Co.</u>, 102 N.J. 30, 48, 505 A.2d 580, <u>cert. denied</u>, 479 U.S. 820, 107 S.Ct. 84, 93 L.Ed. 2d 38 (1986), New Jersey courts have not considered themselves bound by federal caselaw, "even though [the NJLAD] relates essentially to the same subject matter as parallel federal civil rights law. We are free to apply our own concept of that which is right and proper in the circumstances. <u>Castellano v. Linden Board of Education</u>, 158 N.J. Super. 350, 360, 386 A.2d 396 (App. Div. 1978) (holding that pregnancy discrimination violated NJLAD despite contrary United States Supreme Court precedent), <u>modified on other grounds</u>, 79 N.J. 407, 400 A.2d 1182 (1979). Moreover, "mindful of the clear and positive policy of our state against discrimination," New Jersey courts have consistently held that "[e]ffectuation of that mandate calls for liberal interpretation of any legislative enactment designed to implement it." <u>Castellano</u>, 158 N.J. Super. at 361, 386 A.2d 396.

<u>Carrington v. RCA Global Communications, Inc.</u>, 762 F. Supp. 632, 644 (D.N.J. 1991). <u>See</u> <u>also</u> <u>Abrams v. Lightolier, Inc.</u>, 841 F. Supp. 584, 590 (D.N.J. 1994) ("This court is not persuaded that the New Jersey State Supreme Court would disavow the standard enunciated in <u>Slohoda</u> [v. United Parcel Service, Inc., 504 A.2d 53 (N.J. Super. Ct. App. Div. 1986)] to find that the NJLAD

In *Castellano v. Linden Board of Education*, 386 A.2d 396 (N.J. Super. Ct. App. Div. 1978), the New Jersey Superior Court addressed whether requiring a pregnant female teacher to take a mandatory maternity leave and refusing to permit her to utilize accumulated sick leave during her childbirth absence constituted impermissible gender discrimination. *Id.* at 354. The United States Supreme Court, prior to the decision in *Castellano*, held that a disability plan provided by an employer for all its employees, which paid weekly non-occupational sickness and accident benefits, but excluded from coverage disabilities arising from pregnancy, did not violate Title VII of the Civil Rights Act of 1964. *General Electric Co. v. Gilbert*, 429 U.S. 125 (1976). *See also Nashville Gas Co. v. Satty*, 434 U.S. 136 (1977) (holding that an employer's policy of compensating employees for limited periods of time during which the employee missed work because of a non-job related illness or disability, but excluding sick leave paid to pregnant employees, was legally indistinguishable from the disability insurance

(..continued)
warrants application of the `sole motivating factor' test [announced in *Griffiths v. CIGNA Corp.*, 988 F.2d 457 (3d Cir. 1993)] in pretext cases."); *United States v. Board of Educ. of the Township of Piscataway*, 798 F. Supp. 1093, 1099 (D.N.J. 1992) ("[T]here is nothing to indicate that the New Jersey Supreme Court would exhibit a `slavish devotion' to federal law.").

program in Gilbert).[17]  In response to Gilbert and Satty the New

Jersey Superior Court stated:

> Clearly, we are not bound by those decisions
> in construing our own statute, even though it
> relates essentially to the same subject
> matter as the parallel federal civil rights
> law.  We are free to apply our own concept of
> that which is right and proper in the
> circumstances.

Id. at 401 (citing Oakwood at Madison, Inc. v. Madison Tp., 371

A.2d 1192 (N.J. 1977); State v. Johnson, 346 A.2d 66 (N.J.

1975)).  Cf. Robinson v. Cahill, 303 A.2d 273 (N.J. 1973), cert.

denied, 414 U.S. 976 (1973).

There have also been other areas where the New Jersey

courts have departed from federal precedent.  In Lehmann v. Toys

"R" Us, Inc., 626 A.2d 445 (N.J. 1993), the New Jersey Supreme

Court did not adopt the test we set forth in Andrews v. City of

Philadelphia, 895 F.2d 1469 (3d Cir. 1990), for a sexual

harassment claim under the LAD.  There we set forth a five factor

test to determine an actionable claim for sexual harassment under

Title VII, creating a test with both subjective and objective

standards.  Andrews, 895 F.2d at 1482-83.  The New Jersey Supreme

Court disavowed the Andrews test and found its own elements of a

---

[17].      Notably, on October 31, 1978, Title VII of the Civil
Rights Act of 1964 was amended to include pregnancy-based
discrimination in its prohibition of sex discrimination.  See
California Fed. Sav. & Loan Ass'n v. Guerra, 478 U.S. 272, 284-85
(1987).

hostile work environment for a sexual harassment cause of action

under the LAD.  <u>Lehmann</u>, 626 A.2d at 451-54.  The court stated:

> We find that the standards expressed in the
> EEOC Guidelines, while helpful, are
> insufficiently structured to define the cause
> of action at this stage in the development of
> the law.  However, we agree with the dissent
> below that the Third Circuit's <u>Andrews</u> test
> employed by the majority below contains too
> many analytical difficulties and deficiencies
> to be usefully employed here.
>
> Rather than risking confusion by engrafting
> major revisions to the <u>Andrews</u> test, we
> announce a new test in the hope of creating a
> standard that both employees and employers
> will be able to understand and one that
> employers can realistically enforce.  We
> cannot overstate the importance we place on a
> test that allows employees to know their
> rights in a given set of circumstances and
> that allows employers to set policies and
> procedures that comply with that test.

<u>Id.</u> at 453.[18]

### III.

In <u>Lehman</u>, the New Jersey Supreme Court also discussed

the legislative intent and public policy behind the New Jersey

LAD:

> The New Jersey law against discrimination was
> first enacted in 1945.  Its purpose is
> "nothing less than the eradication `of the
> cancer of discrimination.'"  The opportunity
> to obtain employment "is recognized as and

_____

[18]. Notably, the United States Supreme Court has recently undertaken to define the elements of a sexual harassment claim under Title VII.  <u>Harris v. Forklift Systems, Inc.</u>, 114 S. Ct. 367 (1993).

declared to be a civil right."  N.J.S.A.
10:5-4.

The LAD was enacted to protect not only the
civil rights of individual aggrieved
employees but also to protect the public's
strong interest in a discrimination-free
workplace.  Freedom from discrimination is
one of the fundamental principles of our
society.  Discrimination based on gender is
"peculiarly repugnant in a society which
prides itself on judging each individual by
his or her merits."

Id. at 451-52 (case citations to quotations omitted).  See also

Shaner v. Horizon Bancorp, 561 A.2d 1130, 1131-32 (N.J. 1989);

Anderson v. Exxon Co., 446 A.2d 486, 490 (N.J. 1982) ("Our court

has repeatedly emphasized the strong public policy of New Jersey

against employment discrimination.").  In Fuchilla v. Laman, the

New Jersey Supreme Court engaged in a similar discussion of the

public policy in New Jersey:

We begin by recognizing that the clear public
policy of this state is to abolish
discrimination in the workplace.  Indeed, the
overarching goal of the law is nothing less
than the eradication "of the cancer of
discrimination."  Jackson v. Concord Co., 54
N.J. 113, 124 (1969).  As the Legislature has
declared, "discrimination threatens not only
the rights and proper privileges of the
inhabitants of the State but menaces the
institutions and functions of a free
democratic state."  N.J.S.A. 10:5-3.  The day
is long past when any employee need endure
discrimination because of his or her race,
religion, national origin, or gender.
Employment discrimination is not just a
matter between employer and employee.  The
public interest in a discrimination-free
workplace infuses the inquiry.  David v.
Vesta Co., 45 N.J. 301, 327 (1965).

Fuchilla v. Laman, 537 A.2d 652, 660 (N.J. 1988), cert. denied, University of Medicine and Dentistry of New Jersey v. Fuchilla, 488 U.S. 826 (1988).[19]  These passages relied in part on the New Jersey Legislature's declaration that employment in New Jersey shall be free from discrimination.  N.J. Stat. Ann. 10:5-3, 5-4.  For the full text, see Majority slip op. at 15 n.6.  I find this proclamation overwhelmingly persuasive.

I am cognizant of other New Jersey caselaw stating the contrary:

> In a sex discrimination case arising under the N.J. L.A.D., our supreme court held that the test for prima facie showing was the same as that used in federal cases arising under Title VII of the Civil Rights Act of 1964. Because the provisions of the ADEA were modeled after Title VII and are nearly identical in wording and purpose, Title VII standards are applied to ADEA cases.  We thus conclude, as did the judge below, that plaintiffs' contentions should appropriately be analyzed by examination of federal cases arising under Title VII and the ADEA.

---

[19]. Additionally, the New Jersey Supreme Court has led the way in furthering the rights of employees in other areas.  Shebar v. Sanyo Business Systems Corp., 544 A.2d 377 (N.J. 1988) (oral promise of discharge for cause only, even though employment was terminable at will, may be enforceable); Woolley v. Hoffmann-LaRoche, Inc., 491 A.2d 1257 (N.J. 1985) (a written implied promise of discharge for cause only, even though employment was terminable at will, may be enforceable); Pierce v. Ortho Pharmaceutical Corp., 417 A.2d 505 (N.J. 1980) (adopting a general public policy exception to employment at will recognizing that an at-will employee cannot be discharged for reasons contrary to public policy).

Giammarino v. Trenton Bd. of Educ., 497 A.2d 199, 202 (N.J. Super. Ct. App. Div. 1985), cert. denied, 508 A.2d 212 (1985), cert. denied, 475 U.S. 1141 (1986) (citations omitted). However, in that case the court followed Supreme Court precedent because, at the time, the Supreme Court was consistent with New Jersey public policy. This does not lead to the conclusion that New Jersey will continue to follow the Supreme Court. The above passage was correct when stated, but is now doubtful. Cf. Clowes v. Terminix Intern, Inc., 538 A.2d 794, 802 (N.J. 1988) (holding that alcoholism is a handicap under the New Jersey LAD: "We begin our analysis from the perspective that because the [LAD] is remedial social legislation, it is deserving of a liberal construction.").

IV.

The major premise of the majority's opinion is that the New Jersey rule regarding presumptions parallels the federal rule of presumptions upon which Hicks is based. Majority slip op. at 18. I am not persuaded that the New Jersey rule so closely resembles the federal rule that it justifies serving as the basis of this decision, particularly in light of the liberal anti-discrimination policy adopted by both the New Jersey Legislature and the New Jersey Supreme Court.

> The Federal Rule of Evidence on presumptions states:
>     In all civil actions and proceedings not
> otherwise provided for by Act of Congress or
> by these rules, a presumption imposes on the

party against whom it is directed the burden of going forward with evidence to rebut or meet the presumption, but does not shift to such party the burden of proof in the sense of the risk of nonpersuasion, which remains throughout the trial upon the party on whom it was originally cast.

Fed. R. Evid. 301.  The New Jersey rule on presumptions states:

Except as otherwise provided in Rule 303 or by other law, a presumption discharges the burden of producing evidence as to a fact (the presumed fact) when another fact (the basic fact) has been established.

If evidence is introduced tending to disprove the presumed fact, the issue shall be submitted to the trier of fact for determination unless the evidence is such that reasonable persons would not differ as to the existence or nonexistence of the presumed fact.  If no evidence tending to disprove the presumed fact is presented, the presumed fact shall be deemed established if the basic fact is found or otherwise established.  The burden of persuasion as to the proof or disproof of the presumed fact does not shift to the party against whom the presumption is directed unless otherwise required by law.  Nothing in this rule shall preclude the judge from commenting on inferences that may be drawn from the evidence.

N.J. R. Evid. 301.  A comparison of the two rules reveals that the federal rule "bursts the bubble" of the presumption, while the New Jersey rule creates an issue for the jury.  Although the New Jersey rule does not necessarily follow Morgan's theory of presumptions[20] that the party resisting the presumption must

_____

[20].      See generally 9 Wigmore, Evidence § 2493c (Chadbourn rev. 1981).

introduce sufficient evidence to overcome the presumption, it is

certainly not an enactment of Thayer's "bursting bubble"[21] –– it

falls somewhere along the continuum between the two.  One

commentator has placed the New Jersey rule closer to Morgan's

theory than Thayer's because in New Jersey the evidence

supporting the presumption or possibly even the presumption

itself remains.  Ralph N. Del Deo & John H. Klock, 2B New Jersey

Practice Ch. 3 at 334 (1987).[22]  Although the author was

commenting on the former New Jersey rule on presumptions, Rule

14, a comparison between Rule 14 and Rule 301 does not reveal any

substantial change.  The text of the first sentence of the second

paragraph of Rule 301 is essentially the same as Rule 14.  The

added language does not change the effect of the rule.  Rule 14

states:

> Except as provided by Rule 15, if
> evidence to the contrary of a presumed fact

---

[21].        See generally 9 Wigmore, Evidence § 2490 (Chadbourn
rev. 1981).

[22].        The New Jersey Model Jury Charges – Civil (4th ed.
1992) for employment cases supports this interpretation.  In the
section dealing with retaliation for a discrimination claim ––
the only section that discusses the effect of the presumption ––
the model charge cites to Jamison v. Rockaway Township Bd. of
Educ., 577 A.2d 177, 182 (N.J. Super. Ct. App. Div. 1990) (citing
Wrighten v. Metropolitan Hospitals, Inc., 726 F.2d 1346, 1354
(9th Cir. 1984)), for the proposition that once the plaintiff
proves that the defendant's articulated reason for the alleged
discriminatory action is false, a presumption is created that the
adverse employment action was the product of improper retaliatory
intent and the defendant is required to prove by a preponderance
of the evidence that the adverse action would have been taken
regardless of retaliatory intent.  Model Jury Charges – Civil,
Ch. 2 § 22C.

is offered, the existence or nonexistence of such fact shall be for the trier of fact, unless the evidence is such that the minds of reasonable men would not differ as to the existence or nonexistence of the presumed fact.

See also Majority slip op. at 23 n.10. Rule 14 and presently effective Rule 301 do not follow the previous rule, which was interpreted to be an enactment of Thayer's theory. In Dwyer v. Ford Motor Co., 178 A.2d 161, 171 (N.J. 1962), the court held that a presumption of fact is emptied of all probative force and disappears from the case upon introduction of any proof to the contrary. Cf. McGlynn v. Newark Parking Auth., 432 A. 2d 99, 105 (N.J. 1981). When Rule 14 was enacted, the Commission Note accompanying the new rule explained it this way:

> This rule changes existing law. The rule has been that if contrary evidence was introduced, the presumption was gone . . . . Under this rule a fact issue remains, with no distinction between "logical" and "artificial" presumptions. The effect of the rule is that (a) if there is no evidence to contradict either the underlying fact or the assumed fact, the assumed fact must be taken to exist and the jury should be so instructed . . .; and (b) if there is evidence to contradict either the underlying fact or the assumed fact . . ., the jury is to determine the existence of the assumed fact as on any other contest issue.

Ralph N. Del Deo & John H. Klock, 2B New Jersey Practice Ch. 3 at 334 (1987).

Although this interpretation has not been formally adopted by the New Jersey Supreme Court, its existence

demonstrates that reasonable minds can differ on the issue. That being the case, I cannot conclude that the New Jersey Supreme Court would follow the Supreme Court's analysis in Hicks, particularly in light of New Jersey's public policy to eradicate discrimination from the workplace. At least one other state supreme court has chosen not follow Hicks because it has interpreted its own rule of evidence on presumptions differently. Schweigert v. Provident Life Ins. Co., 503 N.W.2d 225 (N.D. 1992).

V.

Because New Jersey is clearly dedicated to preserving a low threshold for establishing a civil rights violation with regard to employment discrimination,[23] I would hold that the New Jersey Supreme court will not adopt for the LAD the Supreme Court's analysis in Hicks.

---

[23]. In sum, the LAD provides a distinctive cause of action arising from unlawful employment practices and unlawful discrimination in employment. The overarching goals of the LAD are not only vindication for aggrieved individuals victimized by discrimination. Protection for other persons similarly situated and the eradication of invidious discrimination in the exercise of civil rights are also paramount concerns of the LAD. The LAD confers broad and extensive remedial powers to fulfill these goals and to counteract the practices and effects of such unlawful practices and discrimination.

Shaner v. Horizon Bancorp, 561 A.2d 1130, 1136 (N.J. 1989).